Dennis ANDERSON, Plaintiff–Appellee,

v.

Gilberto ROMERO and Arthur Douglas, Defendants–Appellants.

No. 94–1251.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 1995.

Decided Dec. 15, 1995.

---

7. *See, e.g., United States v. Turcks,* 41 F.3d 893, 897–98 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1716, 131 L.Ed.2d 575 (1995).

Jerold S. Solovy, Joel J. Africk, Ruth A. Bahe–Jachna (argued), Stephen L. Wood, Jenner & Block, Chicago, IL, for Dennis Anderson.

Rita M. Novak, Office of the Attorney General, Chicago, IL, Thomas L. Ciecko, Office of the Attorney General, Criminal Appeals Division, Chicago, IL, Daniel N. Malato (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Gilberto Romero and Arthur Douglas.

Barry C. Taylor, Chicago, IL, for Lambda Legal Defense & Education Fund, Incorporated, Amicus Curiae.

Before POSNER, Chief Judge, and COFFEY and FLAUM, Circuit Judges.

POSNER, Chief Judge.

While an inmate at Stateville penitentiary, Dennis Anderson was discovered to be infected with the AIDS virus, HIV (human immunodeficiency virus). The virus gradually destroys an essential component of the immune system, exposing the host to opportunistic infections that eventually kill him. In 1992, after being transferred to Joliet, another Illinois prison, Anderson brought suit for damages and an injunction under 42 U.S.C. § 1983. The complaint alleges that defendant Romero, the superintendent of the cell house at Joliet in which Anderson was placed, told defendant Douglas, a guard, in the presence of another guard, to make sure that Anderson was put in a cell by himself because he was HIV-positive. Douglas told at least one other guard that Anderson was HIV-positive. Later Douglas noticed an inmate named Curry sleeping on the floor of Anderson's cell. (Curry was not Anderson's cellmate. How he got into the cell is not explained.) He told Curry that Anderson was a homosexual and a faggot and that Curry could catch AIDS from him and so had better stay away from him. On another occasion, while Anderson and Curry were standing next to an ice machine, Douglas said to Anderson, "Get away from the ice machine. Pretty soon you will have the whole institution infected." Douglas told an inmate barber not to cut Anderson's hair because Anderson had AIDS. Romero denied Anderson yard privileges for several months, and Anderson believed that this was because he was HIV-positive. All these are just allegations in a complaint; they may be false; but they have not (yet) been denied, and they are not so incredible as to be unworthy of belief on their face. We must therefore take them as true.

The complaint charged that the defendants had violated both Anderson's constitutional right of privacy and the Illinois AIDS Confidentiality Act, 410 ILCS 305/1 et seq., by revealing that he was infected with the AIDS virus, and also that they had deprived him of the equal protection of the laws and of liberty without due process of law by preventing him from having his hair cut and from exercising. All these acts are also charged as cruel and unusual punishments. The defendants moved to dismiss the complaint, citing the qualified immunity of public officers from suits for damages. The judge denied the motion on the ground that there were not enough facts in the record to determine whether the defense of immunity was valid. The defendants appealed. Anderson died of AIDS while the appeal was pending, and after determining that the suit survived his death we appointed his lawyers to carry on the suit as the representatives of his estate. 42 F.3d 1121 (7th Cir.1994). The Lambda Legal Defense and Education Fund, a homosexual-rights organization, has filed a brief as amicus curiae urging affirmance of the district court's decision. The brief makes a variety of legal arguments and in addition documents the discrimination in housing, employment, and other dimensions of living that many people who are known to be infected with the AIDS virus encounter.

■ If a defendant's immunity from suit depends on a resolution of conflicting factual assertions, or even on determining whether there is a contestable factual question material to the defense of immunity, the court of appeals has no jurisdiction to review the denial of the immunity. *Johnson v. Jones,* —— U.S. ——, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). The reasons the Supreme Court has given for this rule are that district judges have a comparative advantage in determining factual issues (whether there is a genuine issue of material fact is technically a question of law, but its resolution depends on an assessment of the evidence submitted in support of and opposition to the request for summary disposition) and that having to dig deep enough into the facts of the case to answer the question would entangle the appellate court in the merits of the underlying claim, as distinct from the analytically separate issue of immunity. *Id.* at ——–——, 115 S.Ct. at 2156–58. It does not follow from either the rule or its rationale that the presence of factual disagreement automatically vitiates an immunity appeal. If there is no possible resolution of the disagreement that would save the plaintiff's case from the defense of immunity, the appellate court will not have to resolve any factual disagreements, or even decide whether there are

material factual disagreements, in order to determine whether the defense is good.

■ From the district judge's cryptic discussion we cannot be sure what facts bearing on the defense of immunity he thought in doubt. The only factual uncertainty to which he alluded was whether the defendants had acted pursuant to some duly deliberated prison policy concerning the disclosure of an inmate's HIV status or had disclosed Anderson's status "casually," that is, without reference to any policy. This would be material only if there might be immunity for following a policy but not for acting without reference to a policy. It is not clear how the existence of a policy would affect the issue of immunity, although it could affect the underlying merits of the suit. The parties have not attempted to enlighten us on this score. It occurs to us that by the reference to acting "casually" the judge may have meant acting out of personal spite rather than genuine concern with the danger posed by AIDS, a motivation that could conceivably be inferred from Douglas's use of the word "faggot." Proof of spite does not nullify a defense of immunity. *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir.1989). The test for immunity is an objective one. But misuse of official authority for private ends is a recurrent feature of cases in which a deprivation of life, liberty, or property without due process of law is found. *Screws v. United States*, 325 U.S. 91, 93, 111, 65 S.Ct. 1031, 1032, 1040, 89 L.Ed. 1495 (1945) (plurality opinion); *Gibson v. City of Chicago*, 910 F.2d 1510, 1518 (7th Cir.1990). The distinction is between an act that is justifiable if considered without regard to the actor's motive—objectively justifiable—and an act that, not being objectively justifiable, is explicable only in terms of the actor's motivation, as in a case of police brutality so egregious that it can be explained only by reference to a racist or other improper motive for the defendant officer's action.

So Douglas's spitefulness, if that is what it was, is irrelevant to the question whether he acted with justification in disclosing Anderson's HIV status, or more precisely whether it was clear in 1992, when this suit was brought, that in disclosing Anderson's HIV status Douglas was infringing a constitutional right of a prison inmate to hide his being HIV positive. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

A brief sketch of the history of the legal concept of privacy will help frame the issue. The concept originated in a famous article by Warren and Brandeis that found latent in a number of areas of the common law, ranging from copyright to trespass, a policy of protecting people against the invasion of their "private space" (not Warren and Brandeis's term) and the involuntary revelation of personal, private facts about them. Samuel D. Warren & Louis D. Brandeis, "The Right to Privacy," 4 *Harv.L.Rev.* 193 (1890). After a lag, the concept proposed by Warren and Brandeis fructified in a distinct, many-branched tort of invasion of the right of privacy, a tort that could be committed by wiretapping and other electronic eavesdropping, by publicity that cast a person in a false light, by publicizing intimate details of a person's life or person, by intrusive surveillance (as by searching through a person's private papers), and even by using a celebrity's name or likeness in advertising without the celebrity's consent. *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1229 (7th Cir.1993). Until quite recently only the first and the fourth of these forms of invasion of privacy—electronic surveillance and intrusive surveillance—were thought to have a constitutional dimension. The search of a person's home or person for contraband or other incriminating evidence of crime has been subject to the restrictions of the Fourth Amendment since 1789. The Supreme Court first wrestled with the question whether electronic eavesdropping is also governed by the Fourth Amendment in *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), and held that it was not unless the installation of the listening device involved a trespass, which in the ordinary case it would not. See also *Goldman v. United States*, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942). This interpretation of the Fourth Amendment, limiting it to the protection of property rights, was later rejected in a decision that emphasized the role of the amendment in protecting privacy. *Katz v. United States*,

389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Meanwhile the term "privacy" was beginning to be used in the law in a completely different sense from concealment or seclusion—as the name of the right, not specifically enumerated in the Constitution but held to be implicit in it, to sexual freedom and reproductive autonomy, the right whose culminating expression was the right to abortion recognized in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

A right to conceal one's medical history is readily derivable from the branch of the tort of invasion of privacy that protects people against the indiscriminate publicizing of intimate details of their personal lives. But that branch has evolved mainly as a part of the common law, rather than of the constitutional law, of privacy. Nothing in the Fourth Amendment or in the cases recognizing a right of sexual and reproductive autonomy bears directly on the interest in the privacy of one's medical records. Although there are cases in which a demand for medical records might be met by a defense based on the Fourth Amendment or even the right of sexual privacy, this case is not one of them.

The strongest precedent in the Supreme Court for recognizing a constitutional right to conceal one's medical history is *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The holding was that a statute which required the maintenance of records of the identity of people for whom physicians prescribed certain dangerous though lawful drugs did *not* invade any constitutional right of privacy. The Court implied, however, that the disclosure by or under the compulsion of government of a person's medical records might invade a constitutional right of privacy, presumably a "substantive due process" right, though the opinion is very vague on this, perhaps deliberately so. See *id.* at 598–600, 605–06, 97 S.Ct. at 875–77, 879–80. A subsequent case, *Nixon v. Administrator of General Services,* 433 U.S. 425, 457–58, 97 S.Ct. 2777, 2797–98, 53 L.Ed.2d 867 (1977), is more explicit about the existence of a constitutional right of privacy of personal papers, though they were not in that case medical records and, again, the plaintiff lost. A number of cases in the lower federal courts,

including our own, building on *Whalen* and *Nixon,* recognize a qualified constitutional right to the confidentiality of medical records and medical communications. See, e.g., *Pesce v. J. Sterling Morton High School,* 830 F.2d 789, 795–98 (7th Cir.1987); *Schaill by Kross v. Tippecanoe County School Corp.,* 864 F.2d 1309, 1322 n. 19 (7th Cir.1988); *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994); *F.E.R. v. Valdez,* 58 F.3d 1530, 1535 (10th Cir.1995); *United States v. Westinghouse Electric Corp.,* 638 F.2d 570, 577–80 (3d Cir.1980). (*Doe* actually involved the plaintiff's HIV status.) The existence of the right was described as an open question in *Borucki v. Ryan,* 827 F.2d 836, 848 (1st Cir.1987), and the right has been expressly rejected by the Sixth Circuit. *J.P. v. DeSanti,* 653 F.2d 1080, 1087–91 (6th Cir.1981); *Doe v. Wigginton,* 21 F.3d 733, 740 (6th Cir.1994). But it is recognized by our court and was in 1992.

None of the cases that have recognized the right involve inmates. Obviously they do not have all the rights of free persons. The Supreme Court has actually held that prison inmates have no right of privacy, *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984), though this was with reference to the Fourth Amendment and it would be premature to assume that the Court meant to extinguish claims of privacy of an entirely different kind. In a number of cases—two in this circuit, one of them long preceding the events in this case, the other postdating *Hudson*—prisoners have been held to retain a limited right of privacy. *Smith v. Fairman,* 678 F.2d 52 (7th Cir.1982) (per curiam); *Canedy v. Boardman,* 16 F.3d 183 (7th Cir.1994); see also *Cornwell v. Dahlberg,* 963 F.2d 912, 916–17 (6th Cir.1992); *Kent v. Johnson,* 821 F.2d 1220, 1227 (6th Cir.1987); *Cookish v. Powell,* 945 F.2d 441, 446–47 (1st Cir.1991) (per curiam). But the right in question in those cases was a right against humiliating searches or surveillance of prisoners of one sex by guards of the opposite sex, rather than against the revelation of a prisoner's medical records. Both the majority and the dissenting opinion in *Johnson v. Phelan,* 69 F.3d 144 (7th Cir.1995), conclude that those cases are more accurately characterized as

involving the infliction of cruel and unusual punishments than as involving an invasion of a prisoner's right of privacy. But that is a detail. What is important here is that a different sense of privacy is invaded when prison guards maintain visual surveillance of prisoners of the opposite sex engaged in bathing, urination, or defecation than when they reveal a person's medical history. The Sixth Circuit as well believes that they are different, since it recognizes the first right but not the second. Compare *Cornwell* and *Kent* with *J.P.* and *Doe*.

We cannot find any appellate holding that prisoners have a constitutional right to the confidentiality of their medical records. The closest is *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir.1991). It involved a challenge to the compulsory testing of inmates for HIV and to the segregation of those who tested positive. The challenge was based in part on a claimed constitutional right to the confidentiality of one's HIV status, just as in this case. (The fact of segregation, of course, revealed the prisoners' HIV status.) The court refused to go further than to "assume *arguendo* that seropositive prisoners enjoy some significant constitutionally-protected privacy interest in preventing the non-consensual disclosure of their HIV-positive diagnosis to other inmates, as well as to their families and other outside visitors to the facilities in question." *Id.* at 1513; see also *id.* at 1515. This is not a holding that inmates have such a right.

Now, even if there is no such right, we can assume that certain disclosures of medical information or records would be actionable. But they would be actionable under the cruel and unusual punishments clause of the Eighth Amendment rather than under the due process clause of the Fourteenth. If prison officials disseminated humiliating but penologically irrelevant details of a prisoner's medical history, their action might conceivably constitute the infliction of cruel and unusual punishment; the fact that the punishment was purely psychological would not excuse it. E.g., *Thomas v. Farley*, 31 F.3d 557, 559 (7th Cir.1994); *Joseph v. Brierton*, 739 F.2d 1244, 1246 (7th Cir.1984); *Williams v. Boles*, 841 F.2d 181, 183 (7th Cir.1988);

*Northington v. Jackson*, 973 F.2d 1518, 1523 (10th Cir.1992). We can imagine, also, that branding or tattooing HIV-positive inmates (the branding of persons who are HIV-positive was once seriously proposed as a method of retarding the spread of AIDS), or making them wear a sign around their neck that read "I AM AN AIDS CARRIER!," would constitute cruel and unusual punishment. So too if employees of the prison, knowing that an inmate identified as HIV positive was a likely target of violence by other inmates yet indifferent to his fate, gratuitously revealed his HIV status to other inmates and a violent attack upon him ensued. Cf. *Bowers v. De-Vito*, 686 F.2d 616 (7th Cir.1982), and the *Billman* case, discussed below; also Abraham Abramovsky, "Bias Crime: A Call for Alternative Responses," 19 *Fordham Urban L.J.* 875 (1992).

But the only question presented by this appeal, so far as the disclosure of Anderson's medical situation is concerned, is whether in 1992 the constitutional right of a prisoner in Anderson's position—that is, a carrier of the AIDS virus—to be free from the specific acts that the defendants are alleged to have committed was clearly established, for if not the defendants cannot be made to pay damages under 42 U.S.C. § 1983. We can recast the issue slightly more concretely as follows: Would a prison employee who was conversant with constitutional case law have known that he could not do the things that Romero and Douglas did? *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). It would not be enough that such employees would have known that disclosing *some* medical records in *some* circumstances (for example, if there were a known danger to the inmate of violence by other inmates) might violate the restrictions that the Eighth Amendment or other sources of constitutional rights place on the treatment of prison inmates. They would have to know that their specific conduct would be held to be within the orbit of the principles that made conduct in the other circumstances unconstitutional. A public officer does not forfeit his immunity from suits for damages by failing to prophesy that his conduct will turn out to be within the reach of an evolving case law.

*Harlow v. Fitzgerald, supra,* 457 U.S. at 818, 102 S.Ct. at 2738; *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985). "[I]n the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton, supra,* 483 U.S. at 640, 107 S.Ct. at 3039.

We go further: even if a right of prisoners to the confidentiality of their medical records in general had been clearly established in 1992, it would not follow that a prisoner had a right to conceal his HIV status. There is a great difference, so far as the balance between privacy and public health is concerned, between a communicable and a noncommunicable disease. A person with a noncommunicable disease is a danger only to himself, and the compelled disclosure of his condition to others is unlikely to further a legitimate interest of the state. But a person with a communicable disease is a danger to others— a grave danger when as in the case of HIV– AIDS the disease is invariably fatal and has already reached epidemic proportions. The fact that some methods of protecting the public from a communicable disease are barbarous, such as branding, does not entail that all are.

■ Neither in 1992 nor today was (is) the law clearly established that a prison cannot without violating the constitutional rights of its HIV-positive inmates reveal their condition to other inmates and to guards in order to enable those other inmates and those guards to protect themselves from infection. Cf. *Camarillo v. McCarthy,* 998 F.2d 638 (9th Cir.1993). We have held that the knowing failure to protect an inmate from the danger posed by an HIV-positive cellmate with a propensity to rape violates the inmate's right not to be subjected to cruel and unusual punishments. *Billman v. Indiana Department of Corrections,* 56 F.3d 785, 788–89 (7th Cir.1995). There is no suggestion that Anderson was a rapist, but consensual sex was as great a danger to Curry if he did not know Anderson's infective status and Anderson did not tell him. (Of course sex in such circumstances would not really be consensual and, indeed, in many states would be a crime.)

Lambda's amicus brief argues that the best way to reconcile the interests of HIV-positive inmates with the interests of potential targets of infection is by the adoption of what are called "universal precautions," whereby everyone who may be infected is treated as if he were infected. OSHA requires dentists to protect their staff against the possibility of infection with the AIDS or hepatitis virus by every patient, however unlikely it is that the particular patient is infected. *American Dental Association v. Martin,* 984 F.2d 823 (7th Cir.1993). Whether the same approach would be adequate in the prison setting may be doubted. It would not protect an HIV-negative inmate from sex with an HIV-positive one, as in the *Billman* case. And it would not be a completely secure protection of guards against the violence of HIV-positive prisoners, since it is possible as a matter of medical theory, though very difficult, to transmit the virus by biting. Katherine M. Richman & Leland S. Rickman, "The Potential for Transmission of Human Immunodeficiency Virus through Human Bites," 6 *Journal of Acquired Immune Deficiency Syndromes* 402 (1993); *United States v. Sturgis,* 48 F.3d 784, 786 (4th Cir. 1995); Glenn Singer, "First Case of HIV Passed by a Human Bite Confirmed," *Salt Lake Tribune,* Oct. 29, 1995, p. D10. And even if the adoption of universal precautions were the best approach for a prison to take, it would not follow that the Constitution required it, let alone that such a requirement was clearly established in 1992. The Constitution rarely requires "the best." That would imply the micro-management of American government by the federal courts. The Eighth Amendment forbids cruel and unusual punishments; it does not require the most intelligent, progressive, humane, or efficacious prison administration. ·

■ Among the alternatives to universal precautions as methods of limiting the spread of AIDS in prison are the segregation of HIV-positive prisoners from the rest of the prison population and the ad hoc warning of endangered inmates or staff. The first alternative has been held to be constitutional against the argument that it results in disclosing the identity of the HIV-positive inmates to the rest of the prison community. *Harris v. Thigpen, supra,* 941 F.2d at 1521;

*Moore v. Mabus,* 976 F.2d 268, 271 (5th Cir.1992); *Camarillo v. McCarthy, supra,* 998 F.2d at 640 n. 1. The second is illustrated by this case. Unless the unconstitutionality of the second alternative was clearly established in 1992, Anderson's estate cannot prevail. Two district court decisions do hold that just the kind of "casual" or nonsystematic disclosure alleged in this case violates the constitutional "right to privacy" of HIV-positive inmates. *Woods v. White,* 689 F.Supp. 874 (W.D.Wis.1988), aff'd without opinion, 899 F.2d 17 (7th Cir.1990) (table); *Rodriguez v. Coughlin,* 1989 WL 59607 (W.D.N.Y.1989). But we agree with the Second Circuit that district court decisions cannot *clearly* establish a constitutional right. *Jermosen v. Smith,* 945 F.2d 547, 551 (2d Cir.1991). (The question whether they could had been left open in *Harlow v. Fitzgerald, supra,* 457 U.S. at 818 n. 32, 102 S.Ct. at 2738 n. 32.) Even *Ohio Civil Service Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988), suggests only, in an aside that we do not find persuasive, that a decision by the *same* district court might clearly establish a right. District court decisions have no weight as precedents, no authority. *Colby v. J.C. Penney Co.,* 811 F.2d 1119, 1124 (7th Cir.1987); *Mueller v. Reich,* 54 F.3d 438, 441 (7th Cir. 1995); *Smith v. Office of Civilian Health & Medical Program,* 66 F.3d 905, 915 (7th Cir. 1995). They are evidence of the state of the law. Taken together with other evidence, they might show that the law had been clearly established. But by themselves they cannot clearly establish the law because, while they bind the parties by virtue of the doctrine of res judicata, they are not authoritative as precedent and therefore do not establish the duties of nonparties.

■ It is true that one of the district court decisions that we have cited, *Woods v. White,* was affirmed—and by this court. But it was affirmed without a published opinion. The unpublished decisions of this court have no weight as precedent. 7th Cir.R. 53(b)(2)(iv). And, although we cannot find any cases on the point, we are confident that an unpublished decision cannot elevate the decision that it affirms to the status of circuit precedent. Since almost all unpublished decisions are affirmances, the effect would be to create

an immense body of precedents consisting of *all* district court decisions that had ever been appealed and affirmed without a published opinion. Such a result would thwart the purpose of having rules such as 7th Cir.R. 53(b)(2)(iv) that limit the number of opinions citable as precedent. The fact that the district court's decision had been published would not be a rational basis for relaxing the rule, for the decision to publish or not is made by the district judge rather than by this court. The district court would be shaping the law of the circuit.

■ The aptness of these reflections is shown by the fact that our unpublished decision in *Woods* did not in fact affirm the holding of the district judge that prisoners have a right to the secrecy of their HIV status. We expressly declined to reach the question. *Woods v. White,* No. 88–2853, slip op. at 5 n. 7, 899 F.2d 17 (7th Cir. March 27, 1990). So on no account can we be thought to have elevated the district court's holding to a holding of this court. Now the issue is before us and we hold that warnings to endangered inmates or staff do not violate the Constitution just because they are ad hoc. Nor can the fact that the Illinois AIDS Confidentiality Act, made applicable to these defendants by Illinois Administrative Rules, Title 20, § 107.310, forbids the disclosure of the results of an HIV test, be decisive. 410 ILCS 305/5, 305/10. Any duty to protect prisoners from lethal encounters with their fellows that is derived from the Eighth Amendment would take precedence over a state law. In light of our decision in the *Billman* case, we do not think that defendant Douglas can be criticized for having warned inmate Curry that the prisoner in whose cell he was seen sleeping was HIV-positive. Or even for having warned the inmate barber about Anderson. The danger that a barber would be infected by an HIV-positive customer is slight. But so is the danger to a dental worker. Yet OSHA, in the regulation that we upheld in the *Martin* case, requires that dental workers take precautions against being infected by their patients; and HIV is far more prevalent in state prisons than in the population at large. See Peter M. Brien & Caroline Wolf Harlow, "HIV in Prisons

and Jails, 1993," p. 1 (U.S. Dept. of Justice, Bureau of Justice Statistics Bulletin, Aug. 1995). The rate is 2.6 percent—more than six times the rate in the population as a whole even if the exaggerated estimate that 1 million Americans are infected is accepted—though it is "only" 1.7 percent in Illinois state prisons.

A barber, especially if he uses a razor, may cut the skin of the person whose hair he is cutting and if he gets the person's blood on a part of his skin where he has a cut or abrasion may become infected. The danger, as we said, is slight, though given the violence endemic to American prisons and the prevalence of HIV and AIDS in those prisons cannot be considered entirely fanciful. It is possible that Douglas labored under a profound misconception about how HIV is transmitted (the ice-machine episode suggests that he did), or that his motivation was vindictive rather than protective, or that it would be far more sensible to tell the barber to wear gloves when cutting any inmate's hair ("universal precautions") than to warn him about a specific HIV-positive inmate. But these points are wide of the issue whether a prisoner has a constitutionally protected right to the concealment of his HIV-positive status from prison staff. We doubt that he has such a right; we are sure the right was not clearly established in 1992.

■ Douglas and Romero are alleged to have done more than warn Curry and the barber. They are alleged to have spread the word generally about Anderson's status, to have prevented Anderson from getting his hair cut (which is different from warning the barber), and to have denied him yard privileges extended to prisoners not known to be infected with HIV. If, as the cases we have cited hold—we believe correctly, in view of the prevalence of HIV in prisons and the amount of violence and homosexual intercourse in prisons—HIV-positive inmates can be segregated from the rest of the prison population, it would seem to follow that they can be identified, since segregation automatically identifies them. Identification might be considered a less restrictive means of protecting the rest of the population than quarantining the infective inmates. Lambda's brief emphasizes the adverse consequences of discrimination against persons known to be infected with the AIDS virus. But the consequences it discusses, such as reduced opportunities for good housing and employment, have no significance in a prison; and the dangers of infection that warrant quarantining the infected population or warning the not yet infected are far greater inside prison than outside. The rape of males is extremely rare outside of prisons; homosexual intercourse is probably less common outside of prisons; and the prevalence of HIV–AIDS is much lower outside of prison. Although an inmate identified as HIV positive may be at greater risk, not of being raped, but of being subjected to other violence, by his fellow inmates, any prisoner who believes that he is at risk from other prisoners can demand to be placed in protective custody. Ill.Admin.Rules, Title 20, §§ 501.300 *et seq.* If the belief is reasonable, refusal to honor the demand would present a grave constitutional issue under our decision in *Billman.*

■ It is one thing to warn other prisoners that an inmate is an HIV carrier; it is another to "punish" him for being a carrier by refusing to allow him to get a haircut or to exercise in the prison yard. Although this is the first appellate case in which these specific modalities of punishing HIV carriers have been alleged, it has long been clear that the Eighth Amendment forbids the state to punish people for a physical condition, as distinct from acts, *Robinson v. California,* 370 U.S. 660, 666–67, 82 S.Ct. 1417, 1420–21, 8 L.Ed.2d 758 (1962); *Despears v. Milwaukee County,* 63 F.3d 635, 636–37 (7th Cir.1995), and that the equal protection clause forbids the state to treat one group, including a group of prison inmates, arbitrarily worse than another. If the *only* reason that the defendants denied haircuts and yard privileges to Anderson was that he was HIV-positive, and there is no *conceivable* justification for these as AIDS-fighting measures, then the absence of a case involving this specific form of arbitrary treatment would not confer immunity on the defendants. A constitutional violation that is so patent that no violator has even attempted to obtain an appellate ruling on it can be re-

garded as clearly established even in the absence of precedent. *Eberhardt v. O'Malley,* 17 F.3d 1023, 1028 (7th Cir.1994). Anderson's HIV status may not have been the only reason for refusing him a haircut and exercise and there may have been some justification for these measures of which we are not at present aware, but the facts are not sufficiently developed to enable either conclusion to be drawn. We therefore do not have jurisdiction to review the district court's denial of immunity with respect to this part of the complaint.

The complaint also charges that Anderson had an entitlement to a haircut that the defendants could not deprive him of without giving him due process of law. This has nothing to do with AIDS, but the defendants contend that the right Anderson claims is not clearly established and so they are entitled to immunity from this part of the complaint as well. An Illinois statute provides that "all" facilities of the state's department of corrections (thus including the Joliet prison) "shall provide every committed person with access to ... barber facilities." 730 ILCS 5/3–7–2(a). This is mandatory language, and while an element of vagueness is injected by the absence of any indication of how often the inmate is entitled to a haircut (in contrast, the statute says that he is entitled to access to "bathing facilities at least once a week"), the defendants make nothing of this in their appeal and we shall assume therefore that the right to a haircut conferred by the statute is sufficiently definite to count as an entitlement. Nor do the defendants argue that there is an implicit exception for inmates who, being HIV-positive, could pose a danger, however minuscule if proper precautions are taken, of infecting the barber.

▮ Entitlements confer property or liberty rights within the meaning of the due process clauses, rights that a state cannot take away without due process in the sense of notice and a hearing of some sort not here provided to the inmate. *Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 871–72, 74 L.Ed.2d 675 (1983). The defendants misunderstand the plaintiff's argument, thinking that what he is claiming is a novel substantive federal right to a haircut. Not so; the

source of the entitlement is a state statute; federal law merely protects him against having his state entitlement taken away from him without due process of law. There is no novelty to this claim by Anderson, and therefore no basis for a defense of immunity.

But while this appeal was pending the Supreme Court decided *Sandin v. Conner,* — U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Court held that disciplinary measures taken against prisoners, even if they involve the taking away of an entitlement granted by a state statute or prison regulation, are not actionable as deprivations of liberty unless the measure "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2300. In the further proceedings in the district court, the judge will have to consider the bearing of *Sandin* on the contention that refusing to allow a prisoner to have a haircut is actionable as a violation of the right to due process of law.

▮ To summarize the decision thus far, we hold that Anderson's claim for damages based on the assertion that his constitutional rights were violated by the disclosure of his HIV status to other inmates or to prison staff, or by other actions taken against him on the basis of his HIV status (except insofar as those actions are alleged to have been taken purely to punish him for that status), is barred by the doctrine of official immunity. His claim to damages based on the denial of barber services in violation of the due process clause is also not barred, at least on the record compiled thus far.

The complaint also alleges that Anderson was denied yard privileges for "several months" and that this denial, regardless of its motivation, constituted cruel and unusual punishment in violation of the Eighth Amendment. The defendants have not appealed from the denial of immunity from this claim, and so we do not decide whether they are entitled to immunity. We offer a few uncontroversial observations for what limited guidance they may provide the district court. To deny a prisoner *all* opportunity for exercise outside his cell would, the cases suggest, violate the Eighth Amendment unless the prisoner posed an acute security risk if allowed out of his cell for even a short time. *Davenport v. DeRobertis,* 844 F.2d 1310,

1314–16 (7th Cir.1988); *Campbell v. Cauthron,* 623 F.2d 503, 507 (8th Cir.1980); *Spain v. Procunier,* 600 F.2d 189, 200 (9th Cir.1979). Prisoners are entitled to reasonable medical care, and exercise is now regarded in many quarters as an indispensable component of preventive medicine. But cases that purport to recognize a right to *outdoor* exercise, such as *Allen v. Sakai,* 40 F.3d 1001, 1003–04 (1994), amended, 48 F.3d 1082 (9th Cir.1995), and *Spain v. Procunier, supra,* involve special circumstances, such as that the prisoners were confined to their cells almost 24 hours a day and were not offered alternative indoor exercise facilities (*Allen*), or the only alternative offered to the prisoners was exercise in the corridor outside their cells rather than in an indoor exercise facility and the lack of outdoor exercise was merely one of a number of circumstances that in the aggregate constituted the infliction of cruel and unusual punishment. *Spain v. Procunier, supra,* 600 F.2d at 199–200. *Wilkerson v. Maggio,* 703 F.2d 909, 912 (5th Cir.1983), held that an hour a day of indoor exercise satisfied the constitutional minimum.

But these are matters for the district judge to consider in the first instance.

AFFIRMED IN PART, REVERSED IN PART.