**Harold OLIVER, Plaintiff–Appellant,**

v.

**Kent DEEN, Francis Melvin, and Richard Gramley, Defendants–Appellees.**

No. 94–4012.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1995.

Decided Feb. 22, 1996.

eral judges in the late 1960's to forge legal tools to alleviate deplorable, almost unimaginable situations. From a pioneering attempt to protect inmates, who, for instance, because they feared forcible sexual violence and stabbings spent nights clinging to the bars,[1] a body of law has emerged in which inmates sue their keepers for countless alleged deprivations, ranging from being maced to complaints about the kind of music piped into cellblocks. The improvement of many of the conditions of which prisoners complain would, in the view of some, constitute enlightened policy. But that's not the issue. The issue for the federal courts is, of course, determining the level of deprivation which can reasonably be said to implicate the Constitution and thus become the business of a federal judge. Drawing some hard lines is very important, not just for the courts but, in the long run, for the prisoners also. The number of suits has proliferated to the point that both Congress[2] and the courts have begun to look for ways to curb—or even eliminate—prison litigation. The more federal courts intrude themselves into the prisons on minor matters, the more likely they are to be evicted altogether, leaving prisoners to the extremes of the political climate.

Trends outside prisons influence the claims brought by prisoners. In prison, as outside, the debate on the effects of "environmental tobacco smoke," or ETS, goes on. Rights collide. One person's right is another's deprivation. The harmful effects of smoking seem clear to a large proportion of the population. But people continue to smoke; tobacco companies continue to vigorously promote their products. The debate continues outside and inside the walls.

Prison officials all over the country have struggled to accommodate the growing evidence that ETS is harmful and may subject them to liability. It hasn't always been easy. For instance, news reports indicate that on March 1, 1995, the state of Texas instituted an anti-smoking policy in its prisons, includ-

George N. Leighton (argued), Neal & Associates, Chicago, IL, for Harold Oliver.

David R. Moreland, Office of Attorney General, Criminal Appeals Division, Springfield, IL, Daniel N. Malato, Cacilia R. Masover (argued), Office of Attorney General, Civil Appeals Division, Chicago, IL, for Kent Deen, Acting Sergeant, Francis Melvin, Superintendent, Richard B. Gramley, Warden.

Before EASTERBROOK, DIANE P. WOOD, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

The role of the federal courts in regard to conditions of confinement in state prisons is an uneasy one. Conditions in prisons in Arkansas, Alabama, and Mississippi led fed-

---

1. *Holt v. Sarver,* 309 F.Supp. 362 (E.D.Ark.1970); *aff'd,* 442 F.2d 304 (8th Cir.1971).

2. Pending in Congress at the end of calendar year 1995 are bills, for instance, to limit awards of attorney fees under 42 U.S.C. § 1988 to the rate in 18 U.S.C. § 3006A; to limit prospective relief (S. 1279) to require exhaustion of remedies even if the available remedy is not complete (H.R. 2468); to require a showing of physical injury prior to recovery for mental or emotional injury (S. 866).

ing death row. Several county jails in Texas followed suit. Then other news reports on August 15, 1995, indicated that the ban at one county jail was being lifted because it caused many problems: inmates reportedly were smoking dried orange and apple peelings and sneaking cigarettes into jail by placing them in hollowed-out Bibles, raising the price of a pack of cigarettes on the prison black market to $70. This is not an easy issue, though the recommendation that to the extent possible prisons provide smoking and nonsmoking areas seems to be a reasonable one.[3]

This case—as mundane as it is—is close to the intersection of these important issues. In addition, it highlights the tension between resolution of cases on the basis of summary judgment, rather than trial.

Illinois state prison inmate Harold Oliver filed this civil rights action pro se in the United States District Court for the Central District of Illinois. When he filed the suit he was in protective custody at the Pontiac Correctional Center, an Illinois maximum security prison where he was housed from February 1993 until January 1994. He sued Kent Deen, who was in charge of his unit; Francis Melvin, the superintendent of the north cellhouse; and Richard Gramley, the warden. He contends that these officials violated his Eighth Amendment rights by their deliberate indifference to his serious medical needs: that is, he suffers from asthma which is made worse when he is celled with an inmate who smokes. His condition, he says, causes wheezing, shortness of breath, dizziness, and, at times, nausea. He says that despite his condition the prison officials housed him with smokers, and for these alleged wrongs he seeks damages.

The district court granted summary judgment for the prison officials on the basis that they did not ignore a serious medical need nor did Mr. Oliver show that they possessed a subjective intent to expose him to a substantial risk of danger. In his appeal, in which he is represented by very able appointed counsel, he questions whether summary judgment was appropriate in this circumstance. Mr. Oliver contends that there are genuine issues of material fact in the record, requiring that the order granting summary judgment be set aside.

■ Summary judgment is appropriate when there are no genuine disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146 (7th Cir.1994). To successfully resist a motion for summary judgment, the party against whom summary judgment is sought must demonstrate, by competent evidence, that a genuine issue of fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "Summary judgment will not be defeated simply because motive or intent are involved." *Roger*, at 148.

■ We review *de novo* the decision granting summary judgment. *Jackson v. Bunge Corp.*, 40 F.3d 239 (7th Cir.1994). Here, then, are the facts, viewed favorably to Mr. Oliver.

Mr. Oliver's medical records show that he was a "mild asthmatic." In the prison system he has been given medication, Theophylline and a Netatroterenol inhaler, to help him cope with his condition. In his affidavit the prison doctor, Owen Murray, said, "While asthma can be a serious medical problem, Mr. Oliver's condition was only mild and never life-threatening. His condition required no outside hospitalization."

There is no other medical evidence in the record. Mr. Oliver presented, however, the affidavits of fellow inmates,[4] who relate their

**3.** *See, e.g.*, Christine M. Kiggen, *Helling v. McKinney: Warning ... Second–Hand Smoke May be Cruel and Unusual Punishment*, 20 New Eng.J. on Crim. & Civ. Confinement 453 (Summer 1994).

**4.** There is a controversy about four affidavits, originally submitted in response to the answer, entitled "Reply and Motion in Opposition to Dis-

miss." In addition, Mr. Oliver submitted a memorandum of law along with the affidavits. The district court struck the memorandum, but did not mention the affidavits. The issue is whether they were also stricken from the record. In the spirit of construing the facts favorably to the nonmovant, we will assume that they were not.

observations of his condition. The inmates say that Mr. Oliver had difficulty breathing, had chest pains, wheezed, and had, as one inmate put it, "other common symptoms of an 'Asthma Attack' occurring."

Pontiac is not the first Illinois prison in which Mr. Oliver has resided. At other penitentiaries his asthmatic condition was known. A doctor at the prison at Menard, he says, gave instructions that he should have a cellmate who did not smoke. The same was true at other prisons.

Shortly after Mr. Oliver arrived at Pontiac, the medical records officer issued a memorandum, in which he said that Dr. Murray had issued a medical order "that he is to be celled only with a non-smoking cellmate." In a separate memorandum to Mr. Oliver, Dr. Murray advised him that he had been issued a "permit" for a nonsmoking cellmate.

Mr. Oliver was at Pontiac for a little less than a year. For approximately 133 days during that time, he had cellmates who smoked. For approximately 28 days he shared his cell with non-smokers. Much of the time Mr. Oliver had no cellmate—for at least 164 days in 1993, plus whatever time he served in January 1994.

■ The Eighth Amendment prohibits punishments which are incompatible with "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Prison officials must ensure that inmates receive adequate food, clothing, shelter, protection, and medical care. That adequate medical care falls under the ambit of the amendment has been clear since *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). What has also been clear since *Estelle* is that with regard to medical care, not every denial violates the Constitution. *Estelle* prohibits "deliberate indifference to serious medical needs." Medical malpractice, for instance, is not a violation of the amendment. As the Court stated,

[A]n inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton inflic-

tion of pain" or to be "repugnant to the conscience of mankind."

At 106–107, 97 S.Ct. at 292.

The Supreme Court has recently made clear that in Eighth Amendment cases a constitutional violation has two components.

Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious," [citations omitted]; a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.

. . . .

The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment" ... To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind."

*Farmer v. Brennan,* —— U.S. ——, ——, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994).

■ We believe the undisputed facts demonstrate that Mr. Oliver has not satisfied the first element; he has not demonstrated that he has a serious medical need or that he has been denied "the minimal civilized measure of life's necessities."

In determining whether summary judgment is appropriate, we must first clearly understand what Mr. Oliver is claiming. He does not seek injunctive relief. Therefore, this is not a case like *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993), in which the Court determined that an Eighth Amendment claim can be stated to prevent an "unsafe, life-threatening condition," which may not have yet caused a tragic event. The Court found that an inmate "states a cause of action under the Eighth Amendment by alleging that petitioners have, with deliberate indifference, exposed him to levels of ETS [environmental tobacco smoke] that pose an unreasonable risk of serious damage to his future health." At 35, 113 S.Ct. at 2481. *See also Goffman v. Gross,* 59 F.3d 668 (7th Cir.1995).

Mr. Oliver does not claim that he may be harmed in the future—that, for instance, he

could suffer a severe asthma attack in the future. In fact, he could not make that claim in this case. He is no longer at Pontiac. The present officials are no longer his custodians. In addition, there has been a change in the Illinois prison policy as of June 1, 1994, which could undermine such a claim. The Illinois Department of Corrections has announced a policy under which inmates in most situations would be allowed to state their preference for a smoking or nonsmoking cellmate.

The question also is not whether it would have been better or more enlightened to ensure that Mr. Oliver always had a cellmate who did not smoke. As the Court noted in *McKinney*, "standards of decency" are indeed "evolving" on the issue of smoking. As we noted above, more and more people feel that nonsmokers have a right to avoid second-hand smoke. The Illinois Department of Corrections has itself apparently come to that conclusion. All of this "enlightenment," however, is not without resistance from some portion of the population. So it remains somewhat unsettled as to just what the "current standard of decency" is. It is this question which the Supreme Court allowed Mr. McKinney to attempt to prove: he must "establish that it is contrary to current standards of decency for anyone to be so exposed against his will...." At 35, 113 S.Ct. at 2481.

Mr. Oliver's case does not raise the global issues addressed in *McKinney*. The issue here is simply whether Oliver's actual medical condition while at Pontiac was so serious as to implicate the Constitution and provide the basis for an award of damages. Even this issue, however, limited as it is, requires the drawing of difficult lines. A court must determine when the constitutional line is crossed, and this case, like most cases, presents its own unique situation.

Specifically, what we know is that Mr. Oliver was asthmatic and showed signs of distress. A few fellow inmates said smoke made Mr. Oliver wheeze and that he showed other signs of discomfort. That's it. On the other hand, Mr. Oliver's medical records show that he received considerable medical attention for asthma concerns, as well as for other ailments. He never required outside hospitalization, and he even missed a few appointments he had with the medical staff regarding his asthma. Uniformly, the medical records evaluate his asthma as only a mild case. He was given medication and an inhaler. He does not dispute that the medication and the inhaler were a proper medical response to his condition.

He asserts, however, that the additional step of housing him with a nonsmoker at Pontiac was not always taken and that this exacerbated his "serious medical need." Soon after arriving at Pontiac, Mr. Oliver asked to be celled with a nonsmoker. On February 5, 1993, he received a memorandum from Mr. Melvin informing him that smoking was allowed in the prison and that he did not have a "low gallery permit," which we take to have something to do with smoking. On February 8, 1993, Mr. Oliver wrote to Superintendent Melvin, stating in part:

> My request specifically dealt with being authorized a *"Non–Smoking Cell Mate* since there are various inmates in the North House that do not smoke, and a *Low Gallery Permit"*! This is exactly what my request to you stated.

In response, on February 18, 1993, the medical records director at Pontiac sent a memo to Mr. Melvin stating that "Owen Murray, D.O., Medical Director has issued a medical order that Oliver is to be celled only with a non-smoking cellmate." That same day, Dr. Murray sent Mr. Oliver a memorandum stating that a "permit" had been issued for a non-smoking cellmate.

In his affidavit submitted to the district court, Dr. Murray indicated that the language in the medical director's memo was stronger than he would have used. He did not "order" anyone to house Mr. Oliver with a nonsmoker. In his opinion Mr. Oliver's asthma was mild and it was not required that he be celled only with nonsmokers. Other than a few general news articles, which indicate that smoke, as well as many other things, may aggravate an asthmatic condition, there is no evidence in the record that there is a causal relationship between the smoke and the distress Mr. Oliver suffered.

As we said, this case is about what the Constitution requires. Recently, in another prisoner case, *Anderson v. Romero*, 72 F.3d 518 (7th Cir.1995), we noted that "the Eighth Amendment forbids cruel and unusual punishments; it does not require the most intelligent, progressive, humane, or efficacious prison administration." Mr. Oliver's complaint seeks to involve us in the sort of "micromanagement" of a state prison that we deplored in *Anderson*. On this record, Oliver has not demonstrated that he was subjected to cruel and unusual punishment. He cannot show that while he was at Pontiac he had a medical need sufficiently serious to implicate the Constitution or to support his claim for damages. Therefore we affirm the order of the district court granting summary judgment to the defendants.

AFFIRMED.

DIANE P. WOOD, Circuit Judge, dissenting.

The question before the Court in this case is simple: did *pro se* petitioner Harold Oliver bring forward sufficient facts in this medical treatment § 1983 case to defeat the prison officials' summary judgment motion? The majority concludes that he did not. Because I believe this conclusion is based both on a misapprehension of the governing legal standards and a failure to recognize the critical factual disputes in this record, I dissent.

Oliver's complaint, which was typed on the form typically used for prisoner § 1983 cases in the Central District of Illinois, alleged that the named prison officials "deliberately, intentionally, knowingly, capriciously and maliciously 'forced' him to be celled with 'smokers against his will'." The complaint clearly stated that the defendants took these actions "even though the plaintiff complained and objected to being celled with smokers because the plaintiff suffers from 'Asthma'." Oliver asserted that he had been given a medical order that specified he was to have a non-smoking cellmate only. He alleged that cigarette smoke "has an even greater detriment to the lungs and vital organs of an 'Asthmatic' who has been 'Medically Ordered' to cell only with non-smokers." He described the physical symptoms he suffered when he was exposed to smoke, and he repeatedly alleged that his suffering was the result of the deliberate indifference of the prison officials to his medical needs.

By the time the case was ready for summary judgment, Oliver had added a number of additional materials to the record. These included a memorandum dated February 18, 1993, from the Medical Records Director, Ronald C. Gruber, to North Cellhouse Superintendent Francis Melvin, reporting that Medical Director Owen Murray, D.O., had "issued a medical order" for Oliver "that he is to be celled only with a non-smoking cellmate." In response to a request for admissions, Melvin confirmed that he received the memorandum. Melvin also admitted that he knew that Oliver was asthmatic, but denied knowing that Oliver had "a serious medical condition that require[d] him to be celled with non-smokers only." The record also included correspondence between Oliver and Melvin about smoking, in which Melvin advised Oliver to "work it out" with his cellmate. Oliver offered several affidavits from other inmates, who attested that they had observed Oliver having difficulty breathing and that they had seen various prison officials laughing about his situation.

The prison officials themselves attached the affidavit of Dr. Murray to their motion for summary judgment. Dr. Murray confirmed that Oliver's records "note that he was diagnosed as a mild asthmatic on June 18, 1992." He continued by stating "[w]hile asthma can be a serious medical problem, Mr. Oliver's condition was only mild and never life threatening. His condition required no outside hospitalization." The medical records themselves, which were attached to Dr. Murray's affidavit, showed that Oliver had a prescription requiring him to take Theophylline, 300 milligram tablets, twice a day, and Metaprel, two puffs from an inhaler four times per day.

Oliver attached several items to his response to the summary judgment motion. First, he furnished a memorandum he had received from Dr. Murray that stated "a permit has been issued for a non-smoking cellmate." In addition, he attached an article from the June 20, 1994, issue of *Business*

*Week* entitled "Trying to Knock the Wind out of Asthma." *Id.* at 184. The article notes in passing that "several studies have suggested links between asthma and greater air pollution, poverty, and *exposure to cigarette smoke.*" *Id.* (emphasis added). In the course of noting that asthma sufferers may not do enough to get away from the causes of their attacks, it lists as typical causes "cat hair or tobacco smoke." *Id.* He also attached an article from *U.S. News & World Report,* June 20, 1994, entitled "The smoke next door," which addresses the dangers of second-hand smoke more generally. *Id.* at 66.

As the majority notes, upon our *de novo* review of a decision granting summary judgment, we must view the facts in the light most favorable to the party opposing the motion, here Oliver. In order to prevail, Oliver had to satisfy the district court that his allegations stated a claim (and thus he did not lose as a matter of law), and that there were genuine issues of fact on each element of his claim. For an Eighth Amendment medical conditions claim under § 1983, this means showing (1) that he had a serious medical need, and (2) that the prison officials responded to that need with deliberate indifference, or, in the words of *Farmer v. Brennan,* — U.S. ——, ——, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994), with a sufficiently culpable state of mind.

No one disputes that Oliver's *allegations* were enough to satisfy *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *Farmer* and the other Eighth Amendment cases. Both here and in the lower court the issue has been instead whether there were disputed issues of fact. Viewed in this light, it is clear that there is a material dispute of fact about the severity of Oliver's asthma problem, which in turn raises a material dispute of fact about whether the prison officials were deliberately indifferent to his serious medical needs. See *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292.

I begin with Dr. Murrey's affidavit and the supporting medical records. Dr. Murrey states, in conclusory fashion, that Oliver had only a "mild" case of asthma, but that is not the only information we have about Oliver's condition. The medical records themselves were objective evidence before the court about the seriousness of his condition, and they indicated that competent medical personnel believed Oliver required a twice daily dose of 300 mg of Theophylline, and two puffs from a Metaprel inhaler, which contains the sympathomimetic agent metaprotenerol, four times a day. According to the American Thoracic Society, *Standards for the Diagnosis and Care of Patients with Chronic Obstructive Pulmonary Disease* (1986), these prescriptions taken together indicate a relatively serious case of asthma. Mild cases respond to beta-adrenergic agonists (a class of drugs to which metaprotenerol belongs, *id.* at 231). However, the Society states:

> Theophylline is usually given orally as sustained-release formulations for chronic maintenance therapy. Although the benefits of theophylline are difficult to prove in patients with COPD [chronic obstructive pulmonary disorder], its use is favored by most clinicians *when appropriately used sympathomimetic agents fail to produce adequate bronchodilation.*

*Id.* (emphasis added). The prescription of Theophylline is thus objective evidence that the Metaprel inhaler alone was not enough for Oliver's asthma.

The record also contained indications readily comprehensible to a lay person that suggested Oliver's condition was significant. In his deposition, he stated that "[m]y asthma causes me to wheeze, it causes me to be short of breath and causes me to be nauseated at times." He also claimed to suffer from one to two asthma attacks a week during his stay at the prison. Although the prison officials argued that his failure consistently to take his medication indicates that his case was less severe than he claimed, this simply shows that the facts bear more than one interpretation.

I would be the last to claim that a panel of appellate judges, untrained in medicine, should decide how severe Oliver's asthma was. However, that is not our task. The question for us is whether the summary judgment record before the district court, viewed in the light most favorable to Oliver, clearly indicated that there were no genuine

issues of material fact that required a trial. At this preliminary stage, Oliver did not have the burden of refuting the prison doctor's characterization of his case as a "mild" one; he needed only to show that the matter was disputed. In my view, particularly taking into account that he was proceeding *pro se* before the district court and did not have access to extensive medical or other libraries, he satisfied that burden.

There is a second reason to reject the conclusion that the undisputed facts made it clear that Oliver's case was "mild." The Murrey affidavit says that it was mild, "not life threatening." But Eighth Amendment concerns arise before medical needs become literally *life threatening*. Nothing in *Estelle v. Gamble* or in any of the subsequent decisions of the Supreme Court or this Court adopts such a stringent standard. To the contrary, the Supreme Court's decision in *Helling v. McKinney,* 502 U.S. 903, 112 S.Ct. 291, 116 L.Ed.2d 236 (1993), finding that an inmate stated a claim under the Eighth Amendment when he asserted that his exposure to environmental tobacco smoke (ETS) poses a serious danger to his future health, indicates that a claim exists far short of present or future life-threatening situations. This Court's decision in *Del Raine v. Williford,* 32 F.3d 1024 (7th Cir.1994), makes a similar point, in its rejection of the argument that an inmate complaining of being left in a bitterly cold cell should be allowed to proceed only if he alleged (and could show) that the cold caused "frostbite, hypothermia or a similar infliction." *Id.* at 1035. In addition, in two recent cases that also involved the effects of ETS on inmates with breathing problems, the Eighth Circuit found that the allegations survived the defendant prison officials' motions for summary judgment based on qualified immunity. See *Weaver v. Clarke,* 45 F.3d 1253, 1254 (8th Cir.1995) (ETS caused plaintiff "severe headaches, dizziness, nausea, vomiting, and breathing difficulties"), and *Sanders v. Brundage,* 60 F.3d 484 (8th Cir.1995) (ETS aggravated plaintiff's asthma). Based on these decisions, I believe that the district court also erred as a matter of law in granting summary judgment against Oliver.

It is worth reiterating that Oliver clearly alleged that the prison officials' actions in forcing him to share a cell with smokers exacerbated his medical condition. To prove this point, he tried to show that ETS poses a greater and more immediate health risk for an asthmatic than for the general population. Working within the limited resources available to him, he did this in two ways: anecdotally, by supplying affidavits about the physical distress he endured when he was placed with smokers, and directly, through the *Business Week* article he furnished to the court.

Again bearing in mind that the question was whether the facts showed that a genuine issue was present, not whether Oliver's evidence conclusively proved a medical point, I find his showing sufficient to defeat summary judgment. Common sense tells us that asthma is a breathing problem, and that people whose air passages and lungs are weak may well suffer more from environmental pollution (including ETS) than those whose air passages and lungs are strong. The *Business Week* article indicated as much, and, while it may not itself have been admissible evidence at a trial, it indicated the existence of admissible expert evidence. It is hardly realistic to expect a prisoner to track down medical experts and present their direct affidavits on a motion for summary judgment, especially when the prisoner is proceeding *pro se.*

The majority brushes off the evidence Oliver was able to find. In essence it says "other than some evidence tending to prove his position, there isn't any." But this is an odd way to approach summary judgment. Either he met his burden under *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), or he didn't. I conclude that he did.

In fact, my own brief survey of the medical literature has turned up a number of studies that have found that ETS leads to increased morbidity in adult asthmatics. See, for example, Surinder Jindal, Dhijar Gupta and Amarjit Singh, *Indices of Morbidity and Control of Asthma in Adult Patients Exposed to Environmental Tobacco Smoke,* 106 Chest 746 (1994); Prem Menon, Roy J. Ran-

do, Richard P. Stankus, John E. Salvaggio and Samuel B. Lehrer, *Passive cigarette smoke-challenge studies: Increase in bronchial hyperreactivity,* 82 J. Allergy Clin.Immunol. 560 (1992). At a trial, other experts supporting this position might be called, and it is naturally possible that the prison might find experts to testify that ETS has no particularly detrimental effect on asthmatics, whether their condition is mild, serious, or severe. Both the general effect of ETS on asthmatics, and its effect on Oliver in particular, are factual questions that cannot be dismissed on summary judgment.

With respect to Oliver's allegations of deliberate indifference to a known condition, the prison officials do not argue seriously that he failed to make an adequate showing. They dispute his interpretation of the Medical Director's memorandum, and they dispute the "true intent" of Dr. Murrey in authorizing a non-smoking cellmate. These disputes about the prison's actual evaluation of his condition were highly material to Oliver's case, but the district court resolved them on the paper record. However, there is certainly no dispute that Oliver repeatedly told the officials about his asthma, that he repeatedly requested nonsmoking cellmates, that he called their attention to the fact that smoke made it more difficult for him to breathe, and that for a period of time they did not respond.

In conclusion, it is important to remember that this case is not about whether it would be a good idea if prisons banned smoking, or adopted smoking and no-smoking zones, nor is it about what generalized harms ETS may cause. With respect to the former, it is not up to the courts to decide those kinds of internal prison policy matters. With respect to the latter, this is a far narrower and easier case than *Helling,* and the Court's result today therefore is in substantial tension with it. This case is about the effect of ETS on an admittedly asthmatic prisoner, and whether an institution's conscious refusal to place that prisoner in a relatively smoke-free environment amounts to a deliberate refusal to treat a serious medical condition, thereby raising an Eighth Amendment concern. Because I believe that Oliver presented enough evidence to demonstrate that the crucial facts were disputed, I would reverse the judgment below and remand for a trial.