

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-17-2001

# Brown v. Armenti

Precedential or Non-Precedential:

Docket 00-1587

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Brown v. Armenti" (2001). *2001 Decisions.* Paper 79.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/79

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 17, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1587

ROBERT A. BROWN

v.

ANGELO ARMENTI, JR.; CALIFORNIA UNIVERSITY OF
PENNSYLVANIA; BARBARA A. ARMENTI; CUR TIS C.
SMITH; DELORES L. ROZZI; HAYWOOD L. PERR Y;
BONITA A. KLINE; BETH BAXTER; JAMES H.
MCCORMICK; CBS CORP KDKA-TV; WESTINGHOUSE
BROADCASTING COMPANY KDKA-TV; WESTINGHOUSE
CBS HOLDING COMPANY, INC. KDKA-TV; CBS
BROADCASTING INC., aka KDKA-TV; PAUL MAR TINO;
CHARLES D. FOUST; GERALD F. KELLEY; KAREN D.
LUM; LINDA J. MCCLELLAN; DEAN WEBER; CARLEEN C.
ZONI; JUDY ANSILL; WILLIAM F. BARRY; FRANK
DELUCA; CARMINE DURZO; ANNETTE GANASSI; PAUL
LEMMON; EDWARD M. PAULSO; STEVEN STOUT; JOHN
K. THORNBURGH; AARON WALTON; ROBER T WETZEL;
FOUNDATION FOR CALIFORNIA UNIVERSITY
OF PENNSYLVANIA

        Angelo Armenti, Jr.,
        Appellant

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civ. No. 98-cv-01332)
District Judge: Honorable Donetta W. Ambr ose

Argued
March 12, 2001

Before: MANSMANN, BARRY and COWEN, Circuit Judges.

(Filed: April 17, 2001)

John M. Golden, Esquire (Argued)
First & Market Building
100 First Avenue, Suite 825
Pittsburgh, PA 15222

 Counsel for Appellee

D. Michael Fisher
Attorney General
John G. Knorr, III, (Argued)
Chief Deputy Attorney General
Chief, Appellate Litigation Section
Office of Attorney General of
 Pennsylvania
Department of Justice
Strawberry Square
15th Floor
Harrisburg, PA 17120

 Counsel for Appellant

OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this interlocutory appeal, the defendant appeals the District Court's denial of a motion for summary judgment in a section 1983 action where the defendant asserted the defense of qualified immunity. What is unusual her e is the setting -- a public university. In an amended complaint, a tenured professor alleged that he was suspended from teaching a class after he refused the university president's instruction to change a student's grade and that he was discharged after submitting a written criticism of the president to be presented to the university board of trustees. According to the complaint, these wer e acts of retaliation which violated the professor's rights to academic freedom and free speech protected by the First Amendment. We conclude that the amended complaint did not allege deprivations of constitutional rights and that summary judgment should have been granted. We ther efore will

2

reverse the portion of the District Court's judgment that dealt with these issues and remand for the District Court to enter summary judgment for the defendant university president.

When an appellate court reviews the denial of a defendant's claim to qualified immunity, "the appealable issue is a purely legal one: whether the facts alleged . . . support a claim of violation of clearly established law." Mitchell v. Forsyth, 472 U.S. 511, 528 n.9 (1985).[1] Resolving the legal issues, however, requir es "consideration of the factual allegations that make up the plaintif f 's claim for relief." Id at 528. For this r eason, we present the facts as they have been alleged by the plaintiff and do not concern ourselves with weighing the correctness of the plaintiff 's version. Id. Our review is plenary. Abbott v. Latshaw, 164 F.3d 141, 145 (3d Cir. 1998).

I.

For twenty-eight years, plaintiff Robert Br own was employed as a professor at California University of Pennsylvania; he has been tenured since 1972. At the conclusion of the spring 1994 semester, the plaintiff assigned an "F," or "failing," grade to one of his students in

_____

1. Although 28 U.S.C. S 1291 confers jurisdiction upon the courts of appeals to hear appeals from final decisions of district courts, the collateral order doctrine creates an exception to the general rule. In re Montgomery County, 215 F.3d 367, 373 (3d Cir. 2000); Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).

The parties briefed the issue of the defendant's qualified immunity, but the District Court did not explicitly address the question. When it concluded that summary judgment was not appr opriate, however, the Court implicitly ruled on the matter. Even though a district court does not explicitly address the immunity claims, we nonetheless have jurisdiction to review the implied denial of those claims. In re Montgomery County, 215 F.3d at 373. "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable `final decision' within the meaning of 28 U.S.C. S 1291 notwithstanding the absence of a final judgment." Behrens v. Pelletier, 516 U.S. 299, 306 (1996) (quoting Mitchell, 472 U.S. at 530); Sterling v. Borough of Minersville, 232 F .3d 190, 197 (3d Cir. 2000).

3

a practicum course because the student had attended only three of fifteen class sessions. Defendant Angelo Armenti, the university president, ordered that the grade be changed to "Incomplete," but the plaintiff r efused.

The plaintiff alleged that, as a result of his refusal, the university suspended him from teaching the course. He further contended that "[a]s a result of this and other matters, the plaintiff wrote a critical r eview of Defendant Armenti for presentation to the University Board of Trustees." Two years later, the university terminated the plaintiff 's employment.

The plaintiff then filed a sixteen-count complaint in a Pennsylvania state court, naming Armenti and thirty-one other individuals or entities as defendants. The complaint alleged violations of state law as well as of federal and state constitutional law. Pursuant to 28 U.S.C. S 1446(d), the case was removed to the United States District Court for the Western District of Pennsylvania. 2 By the time the District Court considered the motion for summary judgment now before us, the only claims r emaining for disposition were federal civil rights violations alleged against several defendants including Armenti, and a civil rights retaliation claim against Armenti alone. Count V in the complaint stated the retaliation claim against Armenti:

> "80. Defendant Armenti retaliated against Plaintiff because Plaintiff refused to change a student's grade at the order of Defendant Armenti, in violation of Plaintiff 's right to academic free expression, in violation of the First and Fourteenth Amendments to the United States Constitution.
>
> 81. Defendant Armenti retaliated against Plaintiff for Plaintiff 's critical review of Defendant Armenti for the Board of Trustees in violation of Plaintiff 's right to free speech under the First and Fourteenth Amendments to the United States Constitution."

---

2. Because plaintiff alleged claims arising under the Constitution and the laws of the United States, the District Court's jurisdiction was proper under 28 U.S.C. S 1331.

4

The District Court granted summary judgment as to all the claims except for those in Count V. The District Court denied defendant Armenti's motion for summary judgment as to the Count V claims, concluding that both the plaintiff 's criticism of Armenti and the plaintiff 's assignment of student grades were protected speech under the First Amendment. The District Court did not addr ess the defendant's claim to qualified immunity. The defendant filed a timely appeal, asserting again that qualified immunity provides him a defense to the Count V claims.

II.

The doctrine of qualified immunity establishes"that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a r easonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). This doctrine is founded upon the recognized "need to protect officials who are required to exercise their discretion and the r elated public interest in encouraging the vigorous exercise of official authority." Id. at 807 (internal quotations and citation omitted).

We have held that the defendant is entitled to the defense of qualified immunity if none of the following questions can be answered in the affirmative: (1) have the plaintiffs alleged a violation of their statutory or constitutional rights; (2) was the right alleged to have been violated clearly established in the existing law at the time of the violation; and (3) should a reasonable official have known that the alleged action violated the plaintiffs' rights. Rouse v. Plantier, 182 F.3d 192, 196–97 (3d Cir . 1999). The threshold-nature of the inquiry serves tofilter unfounded claims and "promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." Wilson v. Layne, 526 U.S. 603, 609 (1999) (citing County of Sacramento v. Lewis, 523 U.S. 833, 840–42 n.5 (1998)); Siegert v. Gilley, 500 U.S. 226, 232 (1990) ("Decision of [the] purely legal [immunity] question[s] permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims

5

qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits."). We turn, therefore, to the question of whether First Amendment rights were violated.3

III.

The Supreme Court has held that the First Amendment prohibits the government from r egulating speech based upon its substantive content or the message it conveys. Rosenberger v. Rector and Visitors of University of Virginia, 515 U.S. 819, 828 (1995). Here, we must consider whether the alleged actions of the defendant, the pr esident of a public university, had the effect of discouraging speech with a disfavored message and, therefor e, amounted to an improper conditioning of public employment. The plaintiff has alleged two acts of retaliation and two theories supporting First Amendment protection of his speech. First, he asserts that retaliation following the plaintiff 's refusal to change the grade violated a right to academic fr ee expression under the First Amendment. Second, the plaintiff contends that the defendant's firing him for submitting a written criticism violated the generalized free speech rights under the First Amendment. We will consider these arguments in turn.

A.

Employees of federal and state government do not relinquish their First Amendment rights to comment on matters of public interest as a condition of their government employment. Pickering v. Boar d of Education, 391 U.S. 563, 568 (1968). Nor do "students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." T inker v. Des Moines

_____

3. The First Amendment states that "Congr ess shall make no law . . . abridging the freedom of speech . . . ." The Fourteenth Amendment applies this provision of the Bill of Rights to the States. Gitlow v. People
of State of New York, 268 U.S. 652, 666 (1925). In Monroe v. Pape, 365 U.S. 167 (1961), the Supreme Court held that 42 U.S.C. S 1983 creates a remedy for violations of rights secur ed by the Constitution or the laws of the United States. Id. at 172.

School District, 393 U.S. 503, 506 (1968). Furthermore, the Supreme Court has held that the university setting is one in which First Amendment free speech pr otections in that context are of particular importance:

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. T o impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.

Sweezy v. State of New Hampshire, 354 U.S. 234, 250 (1957).

These statements notwithstanding, there ar e recognized limitations upon free speech in the university setting. For example, we held in Edwards v. Califor nia University of Pennsylvania, 156 F.3d 488, 491 (3d Cir . 1998), that "a public university professor does not have a First Amendment right to decide what will be taught in the classroom."

In Edwards, a university professor alleged a violation of his First Amendment rights when the school disciplined him after a series of disputes with the administration over course curriculum. Id. at 490. We concluded that no violation occurred because in the classr oom, the university was the speaker and the professor was the agent of the university for First Amendment purposes. Id. at 491. In support of this conclusion, the Edwards opinion quoted from the Supreme Court opinion in Rosenberger:

> [w]hen the state is the speaker, it may make content-based choices. When the University determines the content of the education it provides, it is the University speaking, and we have permitted the gover nment to regulate the content of what is or is not expr essed when it is the speaker or when it enlists private entities to convey its own message . . . . It does not follow, however, . . . that viewpoint-based r estrictions are proper when the University does not speak itself or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views fr om

7

> private speakers. A holding that the University may not discriminate based on viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles.

Id. at 491-92 (quoting Rosenberger , 515 U.S. 819 (1995).

Edwards distinguished the rights of a professor in the classroom from those out of the classr oom. Id. at 492. "In the classroom" refers to those settings where the professor is acting as the university's proxy, fulfilling one of the functions involved in the university's "four essential freedoms:" choosing "who may teach, what may be taught, how it shall be taught, and who may be admitted to study." Id. at 492 (citing Regents of Univ. of California v. Bakke, 438 U.S. 265, 312 (1978)). Because grading is pedagogic, the assignment of the grade is subsumed under the university's freedom to determine how a course is to be taught. We therefore conclude that a public university professor does not have a First Amendment right to expression via the school's grade assignment pr ocedures.

The plaintiff 's argument to the contrary relies upon the analysis adopted by the Court of Appeals for the Sixth Circuit in Parate v. Isibor, 868 F .2d 821 (6th Cir. 1989). In Parate, a non-tenured professor was forced to sign a memorandum changing a student's grade. Id. at 823-34. He was not permitted to note on the document that the change was "per instructions from [the] Dean . . . ." Id. The Court held that a professor's First Amendment right was violated because the "assignment of a letter grade is a symbolic communication intended to send a specific message to the student . . . [and] is entitled to some measur e of First Amendment protection." Id. at 827 (citing Tinker, 393 U.S. at 505-06). The Court concluded that the University was the speaker only as far as the grade on the student's transcript. Id. at 829.

The Edwards framework, however , applies to the present case and offers a more realistic view of the university-professor relationship. Whether the school registrar is told that a student's performance rates an"F " or an "Incomplete" is not a matter that warrants the"intrusive

oversight by the judiciary in the name of the First Amendment." Connick v. Myers, 461 U.S. 138, 146 (1983); Wozniak v. Conry, 236 F.3d 888, 891 (7th Cir. 2001) ("Some universities offer their faculty more control over grading than [in this case] and maybe discretion is good. But competition among systems of evaluation at dif ferent universities, not federal judges, must settle the question which approach is best."). We note that our holding today is consistent with at least one other Court of Appeals. See Lovelace v. Southern Methodist University, 739 F.2d 419, 426 (2d Cir. 1986) (per curiam).

B.

In his second argument, the plaintiff asserts that retaliation following his submission of a critical evaluation violated his free speech rights under the First Amendment. When resolving such disputes, courts must strike "a balance between the interests of the [employee], as a citizen, in commenting upon the matters of public concern and the interest of the State, as an employer , in promoting the efficiency of the public services it per forms through its employees" when determining whether a public employer acted properly in discharging an employee for engaging in speech. Pickering, 391 U.S. at 568. The thr eshold question in this analysis is whether the employee's speech may fairly be characterized as a matter of public concer n. Rankin v. McPherson, 483 U.S. 378, 384 (1987).

In Connick v. Myers, a District Attor ney fired an Assistant District Attorney for distributing a questionnaire to fellow staff members. 461 U.S. at 141. The survey sought staff views on the office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressur ed to work in political campaigns. Id.

The Court reiterated the balancing described in Pickering, this time addressing a single question in the analysis: whether the subject of the employee's expression was " `a matter of legitimate public concern' upon which `free and open debate is vital to informed decision-making by the electorate.' " Id. at 145 (quoting Pickering, 391 U.S. at 571-72). The Court reasoned that if the employee's speech

cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her dischar ge. When employee expression cannot be fairly consider ed as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

Id. at 146 (internal footnote omitted). The Court pointed to the standard applied in the common law tort for invasion of privacy as the correct standard to apply when determining whether an expression is of a kind that is of legitimate concern to the public. Id. at 143 n.5 (citing Cox Broadcasting Corp. v. Cohn, 420 U.S. 469 (1975)). The Cox standard for determining whether a topic is a legitimate matter of public concern is functional, asking whether there is a public benefit in reporting the matter. 420 U.S. at 495.

In Connick, the Court concluded that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, for m, and context of a given statement, as revealed by the whole r ecord." Id. at 148-49. The Court concluded that all but one of the questions on the survey dealt with the individual employee's dispute with the District Attorney and were not "of public import in evaluating the perfor mance of the District Attorney as an elected official." Id. at 148. Because the questionnaire concerned matters of public interest "in only a most limited sense . . . [t]he limited First Amendment interest involved here does not require that [the employer] tolerate action which he r easonably believed would disrupt the office, undermine his authority, and destroy close working relationships." Id. at 154.

Four years later, in Rankin v. McPherson  the Supreme Court considered the question again -- whether a statement by an employee that led to her firing was a matter of public concern. 483 U.S. at 384. The employee in Rankin worked in a constable's office and had remarked after hearing of an attempt on the life of the Pr esident, "If they go for him again, I hope they get him." Id at 379. In

10

determining the "public concern" threshold test, the Court reasoned that because the statement was made in the context of a discussion about the policies of the Pr esident's administration, and because it was said following a news bulletin of national interest, it "plainly dealt with a matter of public concern." Id. at 386.

Whether the subject matter of the "speech" was a legitimate matter of public concern is a question of law. Connick, 461 U.S. at 148 n.7. The fact that the matter now on appeal is a legal issue distinguishes the pr esent interlocutory appeal from that in Johnson v. Jones, 515 U.S. 304 (1995). In deciding Johnson, the Court resolved a circuit split in the courts of appeals "about the immediate appealability of . . . pretrial `evidence insufficiency' claims made by public official defendants who assert qualified immunity defenses." Johnson, 515 U.S. at 308. Although there is some broad language in Johnson that might suggest the Court foreclosed any consideration of the sufficiency of the evidence when courts of appeals review summary judgment motions, the Court limited the holding in at least two ways. First, it noted that the decision did not change the law for many courts of appeals.4 Johnson, 515 U.S. at 307, 318, 319 (observing that "our holding here has been the law in several Circuits for some time" and referring to a listing of cases that included Giuffre v. Bissell, 31 F.3d 1241 (3d Cir. 1994)). Second, the Court acknowledged that where a district court does not clearly state facts relevant to a question of law, it might be appropriate for a court of appeals to "undertake a cumbersome review of the record to determine what facts the district court . . . likely assumed." Id . at 319. In addition, the Supreme Court recently clarified the holding in Johnson:

> Johnson held, simply, that determinations of

---

4. We had held in Giuffre v. Bissell, 31 F.3d 1241 (3d Cir. 1994), that a claim that "I didn't do it" is differ ent than a claim to the right of qualified
immunity and that a denial of summary judgment motion based on the former is not appealable. Id. at 1258 (citing Burns v. County of Cambria, 971 F.2d 1015, 1019 (3d Cir. 1992)). Our holding in Giuffre is consistent with the later opinion by the Supreme Court.

evidentiary sufficiency at summary judgment ar e not immediately appealable merely because they happen to arise in a qualified-immunity case; if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred, the question decided is not truly "separable" from the plaintif f 's claim, and hence there is no "final decision" under Cohen and Mitchell. Johnson reaffir med that summary judgment determinations are appealable when they resolve a dispute concerning an "abstract issu[e] of law" relating to qualified immunity -- typically, the issue whether the federal right was "clearly established."

Behrens v. Pelletier, 516 U.S. 299, 313 (1996) (citations omitted).

In Grant v. City of Pittsburgh, 98 F .3d 116 (3d Cir. 1996), we observed that "crucial to the resolution of any assertion of qualified immunity is a careful examination of the record (preferably by the district court) to establish, for purposes of summary judgment, a detailed factual description of the action of each individual defendant." Id. at 122. We have also noted that although the qualified immunity inquiry is primarily legal, "some factual allegations . . . are necessary to resolve the immunity question." Gruenke v. Seip, 225 F.3d 290, 299 (3d Cir. 2000). Ther efore, Johnson does not foreclose an appellate court from scrutinizing the evidence put forward by the plaintiff following a qualified immunity summary judgment motion.

The role of a factual inquiry resolving a claim to qualified immunity is addressed in Anderson v. Cr eighton, 483 U.S. 635 (1987). In Creighton, the Supr eme Court considered whether an officer was liable for conducting an unreasonable search if a reasonable officer could have believed that the search was lawful. Id. at 637. The Court required a particular inquiry, stating that the "relevant question in this case . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." Id. at 641. The Court vacated the judgment and remanded the case with specific instructions

12

that any discovery "should be tailored specifically to the question of Anderson's qualified immunity." Id. at 646 n.6.

Creighton instructs that "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' ef fective performance of their duties," id . at 639, requires plaintiffs to respond to a defendant's claim of qualified immunity with evidence that the actions alleged "ar e actions that a reasonable officer could have believed [un]lawful." Id. at 646 n.6. As a result, a respondent does not satisfy the Rule 56(e) burden by relying upon bare allegations or assertions of abstract rights. If the defendant official is liable only where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right," id. at 640, it is reasonable for a court considering a qualified immunity summary judgment motion to require that the plaintif f make clear what the alleged violation is. Where plaintiff fails to present particularized facts, the motion should be granted. 5

In the present case, it is clear that the plaintiff did not satisfy Creighton. The District Court conceded that it did not know the content of the speech at issue. The r ecord contains only two clues about the content of the evaluation: the assertion in the complaint that the plaintif f 's evaluation was "critical," and the plaintiff 's testimony that the evaluation was submitted on a two-page form that "had room to respond to four or five dif ferent things that had to do with academic standards and faculty morale and how the president dealt with various issues on campus." Although his deposition testimony indicates that he had access to a copy of the completed evaluation for m, he did not enter the document into the record. Nor does the plaintiff disclose the substance of his comments on the form, saying only that he did not choose the subjects, but

_____

5. This is not a weighing of evidence for a deter mination of whether there
is a genuine issue of fact, such as the Court held was not appealable in Johnson, because the legal question here is separable from the inquiry that is the basis of the plaintiff 's claim. Behrens, 516 U.S. at 313. Rather, the requirement prevents the clever plaintiff from bypassing the qualified immunity "filter" simply by identifying an abstract right.

13

that his was "a response to an evaluation form that I had been given."

It is the words that the plaintiff wr ote on the form that allegedly motivated the retaliation. When considering a summary judgment motion, a court must have befor e it the "content, form, and context of a given statement, as revealed by the whole record" to determine if the statements were of legitimate public concer n. The plaintiff did not provide such proof, alleging only that the speech was "critical." In the absence of evidence, the District Court improperly inferred that the speech addr essed "academic integrity." By failing to require the proof, the District Court allowed the plaintiff "to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violations of extremely abstract rights." Creighton, 483 U.S. at 639.

Finally, even if we were convinced that the plaintiff 's response to the summary judgment motion satisfied Creighton, we conclude that summary judgment would have been appropriate nonetheless. On the facts found by the District Court, the subject of the plaintiff 's speech closely resembles that of the questions on the survey in Connick. Those dealt with office morale, the transfer policy, and employee confidence in supervisors. Connick , 461 U.S. at 141. The District Court here reasoned that the issues contained speech which was in the category of "academic integrity," "relevant to the gover ning of the University, and therefore, . . . of public concern," but this is comparable to the dissent in Connick concluding that the issues there "could reasonably be expected to be of inter est to persons seeking to develop informed opinions about the manner in which . . . an elected official . . . dischar ges his responsibilities." Id. at 163 (Br ennan, J., dissenting). Had the plaintiff been reprimanded for speaking regarding, for example, grade inflation, a specific subject about which there is demonstrated interest, he might have satisfied this test. As it stands, the speech alleged reflects little more than one employee's dissatisfaction with an administrative decision by his employer, Connick, 461 U.S. at 148-49. As such, there would be no public benefit in r eporting this matter, Cox, 420 U.S. at 495, and wefind no constitutional violation.

14

IV.

We conclude that the defendant is entitled to qualified immunity as to Count V because no actual constitutional violation was alleged. For this reason, that portion of the judgment of the District Court on appeal will be r eversed and on remand the District Court will be instructed to enter summary judgment for the defendant university pr esident.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

15