OPINION OF THE COURT
O’NEILL, District Judge.
This is an appeal from the District Court’s denial of appellants’ motion for summary judgment based on qualified immunity. Appellee, an inmate of the Delaware Department of Correction, asserted civil rights infractions under 42 U.S.C. § 1983, claiming that appellants 1) violated the Eighth Amendment’s prohibition on cruel and unusual punishment by exposing him to environmental tobacco smoke (“ETS”) that created a serious medical need and posed an unreasonable risk of harm (Count I) and 2) retaliated and used excessive force against him for filing his ETS lawsuit (Counts III and IV). Appellants [1] raise three issues on appeal: 1) whether appellants are entitled to qualified immunity for the ETS claims; 2) whether appellants are entitled to qualified immunity on the retaliation and excessive force claims; and 3) whether appellants in supervisory positions are entitled to qualified immunity on all claims because they lacked notice of the underlying events. As to the first two issues, we will affirm the District Court’s denial of summary judgment. We conclude that we lack jurisdiction to decide the third issue.
I. BACKGROUND[2]
Appellee Roger Atkinson is a blind, diabetic prisoner who was housed at Delaware’s Multi-Purpose Criminal Justice Facility (“MPCJF”). Although a former one-pack-per-day smoker, appellee quit in 1995 after receiving surgery for a pituitary ade-noma.
Atkinson’s ETS claims arise under the Eighth and Fourteenth Amendments of the United States Constitution. He asserts that from November, 1998, until November, 1999, appellants subjected him to cruel and unusual punishment by exhibiting deliberate indifference to his claims that he was being involuntarily exposed to high levels of second-hand smoke, which forced him to endure severe allergic reactions to ETS and posed an unreasonable risk of future harm to his health. According to his answers to interrogatories, during a seven-month incarceration at MPCJF he shared a cell with two inmates, each of whom smoked “constantly” while in the cell. Appellee shared another cell with a constant smoker for six weeks, and later with a cellmate who smoked ten cigarettes per day. Appellee also claims that he has been exposed to other smoking cellmates on various occasions.
Shortly after being exposed to ETS and suffering symptoms from it, appellee complained to the medical staff at MPCJF and Sergeant Sonata. Atkinson alleges that when he tried to seek help at the prison infirmary, the treating nurse responded that she was unable to transfer him to a cell with a nonsmoking roommate. Although Sonata moved appellee to a smoke-free area, Way later returned him to a smoking environment. Thereafter appel-lee wrote letters to Williams, Captain Lee, *260 Phelps, Parker, and Taylor about his exposure to ETS. The exposure did not cease.
Appellee twice complained to Parker, the supervisor of Pods IF and IE, about his exposure to ETS, but Parker refused to move him to a smoke-free area. Appel-lee also complained to Green and requested that he be removed from exposure but was not moved.
Atkinson’s amended complaint alleges that he was exposed, with deliberate indifference, to constant smoking in his cell for over seven months and as a result suffered nausea, an inability to eat, headaches, chest pains, difficulty breathing, numbness in his limbs, teary eyes, itching, burning skin, dizziness, a sore throat, coughing and production of sputum. Albert A. Rizzo, M.D., a pulmonary specialist who examined appellee concluded that there was a “reasonable medical probability” that these symptoms were precipitated by secondhand smoke. However, in an affidavit, prison physician Dr. Keith Ivens disputed Dr. Rizzo’s evaluation and contended that Atkinson’s symptoms arose from seasonal allergies. A. Judson Wells, Ph.D. stated in an expert report: “I would say that for Mr. Atkinson to continue in a smoke filled cell would increase his risk of death or non-fatal heart attack or stroke.”
Appellee also asserts that MPCJF officials subjected him to a variety of abuses in retaliation for filing his lawsuit. He contends that Way told him that if he had not complained about ETS he would not have been placed in administrative segregation. On repeated occasions, Way read appellee’s personal mail over the prison’s intercom so that other inmates could hear it. On or before May 4, 2000, notes relating to appellee’s ETS case were taken from his cell and were read over the intercom by Way and Officer Johnson. Way withheld papers that appellee requested from the law library. On other occasions, Way refused to permit appellee to make telephone calls to his attorney. Way also cursed appellee and made derogatory comments about his blindness. When appellee asked Way to stop harassing him, Way again cursed him and stated that Way was above the law. Parker was aware of these actions but failed to stop them. Way and Parker placed appellee in solitary confinement during recreation periods, thereby depriving him of the assistance of people able to read his mail or help him with legal work, allegedly for the purpose of preventing him from proceeding with his civil action. On October 5, 2000, Way prevented appellee from receiving his one hour of recreation and falsely wrote in the prison log that he had refused recreation.
Additionally, appellee either received or was threatened with physical retaliation for filing his lawsuit. In January or February of 1999, Way entered appellee’s cell while he was sleeping, grabbed him by the leg and pulled appellee from his bed, stating that he thought appellee was dead. On March 29, 2000, Way threatened to attack appellee and took appellee’s clothing, leaving appellee without clothing for over ten hours. On another occasion, Way entered appellee’s cell and threatened to smash his face into the wall. Another time, Way stated that he would hang ap-pellee. On multiple occasions, Way prevented appellee from receiving his medications or tampered with his food. Way and Parker have threatened appellee and told him that he would never make it to court. Various times Way told appellee that Way would “kick [his] ass,” that his privileges would be taken away, and that there was nothing that he could do about it. On December 26, 2000, appellee was attacked by Green, who struck him in the face and head. This incident was investigated by the FBI, apparently because of complaints made by appellee’s mother. *261 Thereafter, Way told appellee over the intercom that he would regret bringing the FBI into the matter and that Way would make him pay. When appellee was leaving an interview room Way ordered appel-lee to take off his clothing. After appellee disrobed, Way kicked his clothing around and said that he had to make sure that appellee was not a woman because women were sent to another facility. On December 27, 2000, Green refused to bring appel-lee his breakfast and lunch trays. On February 16, 2001, when appellee returned from a court appearance, he was strip searched in booking, which is standard procedure. Appellee then returned to Pod IF and for no reason Way made him strip again.
According to appellee, he has written to Williams, Phelps, Taylor, and Parker, and spoken to Green, about the harassment he received from Way.
II. STANDARD OF REVIEW
Review by this Court is plenary when a denial of qualified immunity turns solely on a question of law. Brown v. Armenti, 247 F.3d 69, 72 (3d Cir.2001). We recently reiterated that this Court lacks jurisdiction to evaluate the sufficiency of the evidence when reviewing a denial of summary judgment based on a lack of qualified immunity. Walker v. Horn, 286 F.3d 705, 710 (3d Cir.2002) (“[W]e must adopt the facts assumed by the District Court.”); see also Johnson v. Jones, 515 U.S. 304, 319, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (no interlocutory appeal from denial of summary judgment based on remaining genuine issues of material fact). Although we may not evaluate the sufficiency of the evidence to prove the facts allegedly giving rise to a constitutional claim, we may determine whether the facts identified by the District Court constitute a violation of a clearly established constitutional right. See Ziccardi v. City of Philadelphia, 288 F.3d 57, 61 (3d Cir.2002).
III. QUALIFIED IMMUNITY
In Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court explained the two-part inquiry a court must make in order to determine whether a state official is entitled to qualified immunity:
A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer’s conduct violated a constitutional right? ...
If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties’ submissions, the next, sequential step is to ask whether the right was clearly established.
Id. at 201, 121 S.Ct. 2151.
To be clearly established “[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Saucier Court further explained the latter prong of the test:
This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable....
This is not to say that the formulation of a general rule is beside the point, nor is it to insist the courts must have *262 agreed upon the precise formulation of the standard. Assuming, for instance, that various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard.
Saucier, 533 U.S. at 201, 203, 121 S.Ct. 2151.
A. The ETS claims
Atkinson asserts two separate Eighth Amendment claims against defendants stemming from his involuntary exposure to ETS: 1) a claim for potential future harm arising from his exposure to ETS; and 2) a present injury claim stemming from deliberate indifference to existing medical needs caused by ETS. We will sequentially address whether defendants are entitled to qualified immunity for each claim.
1. Future Injury Claim
With respect to the future injury claim, Helling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993), established the constitutional right required by the first prong of the Saucier test for qualified immunity. In Helling, the Supreme Court determined that a cause of action exists under the Eighth Amendment when a prisoner alleges that prison officials have exposed him, with deliberate indifference, to levels of ETS that pose an unreasonable risk of harm to his future health. Id. at 35, 113 S.Ct. 2475 (concluding that prisoner stated a claim where he was forced to share a cell with a five-pack-per-day smoker). As to the second part of the Saucier inquiry, the Helling Court clearly established the elements of a two-part test that a plaintiff must meet to state a valid claim under the Eighth Amendment.
The Court explained that the first prong of the Helling test is an objective one: “[The prisoner] must show that he himself is being exposed to unreasonably high levels of ETS.” Id. at 35, 113 S.Ct. 2475. With respect to the objective factor, the Court noted that beyond a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS, the Eighth Amendment requires “a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.” Id. at 36, 113 S.Ct. 2475 (emphasis in original). The Court stated: “In other words, the prisoner must show that the risk of which he complains is not one that today’s society chooses to tolerate.” Id.
The second prong of the Helling test is a subjective one: whether prison officials were deliberately indifferent to a serious risk of harm. Id. at 36, 113 S.Ct. 2475. The Supreme Court has held that “a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.” Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).
In concluding, the Helling Court held that the prisoner had properly claimed that the level of ETS to which he was exposed unreasonably endangered his future health. Helling, 509 U.S. at 35, 113 S.Ct. 2475. The Court remanded the case *263 so that the prisoner could attempt to prove the objective and subjective elements necessary to establish a violation of the Eighth Amendment. Id.
Since 1993, almost every Court of Appeals that has addressed this issue has recognized that a prisoner’s right to be free from levels of ETS that pose an unreasonable risk of future harm was clearly established by Helling.[3] See Alvarado v. Litscher, 267 F.3d 648, 653 (7th Cir.2001) (affirming District Court’s denial of Rule 12(b)(6) motion to dismiss based on qualified immunity where a prisoner asserted that ETS exacerbated severe chronic asthma); Warren v. Keane, 196 F.3d 330, 333 (2d Cir.1999) (denying prison officials’ motion for summary judgment based on qualified immunity in an ETS case); Whitley v. Hunt, 158 F.3d 882, 887-88 (5th Cir.1998) (concluding ETS claim was wrongly dismissed as frivolous where prison doctor issued report noting that prisoner required nonsmoking quarters), overruled on other grounds by Booth v. Churner, 532 U.S. 731, 735, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001); Rochon v. City of Angola, Louisiana, 122 F.3d 319, 320 (5th Cir.1997) (affirming District Court’s denial of a Rule 12(b)(6) motion to dismiss based on qualified immunity where prisoner asserted that he was forced to live and work in an environment filled with tobacco smoke, even though the smoke had not yet harmed his health but allegedly posed a threat to his health in the future); Jacobs v. Young, No. 94-3241, 1995 WL 150402, at *2 (6th Cir. April 5, 1995) (unpublished opinion) (concluding prisoner’s right to be free from harmful levels of ETS was clearly established in 1993); see also Weaver v. Clarke, 45 F.3d 1253, 1256 (8th Cir.1995) (affirming District Court’s denial of a Rule 12(b)(6) motion to dismiss based on qualified immunity where a prisoner alleged severe headaches, dizziness, nausea, vomiting, and breathing difficulties from rooming with “heavy smoker”); but see Mills v. Clark, No. 99-6334, 2000 WL 1250781, at *4 (4th Cir. Sept.5, 2000) (unpublished opinion) (reversing District Court’s denial of qualified immunity on summary judgment for prison officials because it was not clearly established level of ETS in dormitories posed any unreasonable risk of future harm).[4]
*264 In a case identical in facts and procedural posture to the present one, the' Court of Appeals for the Second Circuit held that a District Court correctly denied prison officials’ summary judgment motion based on qualified immunity where prisoners claimed to be suffering from sinus problems, headaches, dizziness, nausea, shortness of breath, chest pains and asthma from cellmates’ smoking in Sing Sing prison. Warren, 196 F.3d at 333. The Warren Court held that after Helling “it was clearly established that prison officials could violate the Eighth Amendment through deliberate indifference to an inmate’s exposure to levels of ETS that posed an unreasonable risk of future harm to the inmate’s health.”[5] Id. Moreover, the Warren Court concluded that it would be unreasonable for prison officials to believe that they were not violating the prisoners’ Eighth Amendment rights where the District Court determined that “[p]laintiffs’ allegations, if believed, overwhelmingly describe a prison environment permeated with smoke resulting from, inter alia, under-enforcement of inadequate smoking rules, overcrowding of inmates, and poor ventilation.” Id.
In the present case, without weighing the underlying evidence with respect to Atkinson’s claim, we conclude that appellants are not entitled to qualified immunity on the ETS claim of future harm. As the Warren Court recognized, the Helling decision established the constitutional right required by the first prong of the Saucier test. Warren, 196 F.3d at 333; see also Helling, 509 U.S. at 35, 113 S.Ct. 2475. Atkinson invokes the constitutional right claimed by the Helling prisoner: alleging that he was unwillingly exposed to levels of ETS that pose an unreasonable risk of future harm.
Similarly, Atkinson has satisfied the second prong of the Saucier test. The right recognized by the Helling decision is “clearly established” so that a reasonable prison official would know when he is violating that right. See, e.g., Alvarado, 267 F.3d at 653 (“Given the decision in Helling, the right of a prisoner to not be subjected to a serious risk of his future health resulting from ETS was clearly established in 1998-99.”); Warren, 196 F.3d at 333 (“We hold that after Helling, it was clearly established that prison officials could violate the Eighth Amendment through deliberate indifference to an inmate’s exposure to levels of ETS that posed an unreasonable risk of future harm to the inmate’s health.”). The facts of *265 Helling are similar to the facts presented by the appellee. In Helling a prisoner was housed with a five-packs-per-day smoker and complained of “certain health problems.” Id. at 28, 113 S.Ct. 2475. Here, appellee Atkinson was housed for over seven months with “constant” smokers.
As to future harm Atkinson has offered some proof for each element of the alleged Eighth Amendment violation: 1) evidence that he was exposed to unreasonably high levels of ETS, the risk of which is not one that today’s society chooses to tolerate; and 2) evidence that prison officials knew of and disregarded an excessive risk to his health or safety. As to the first element, appellee’s deposition and interrogatory answers state that he was subjected to continuous smoking for at least seven months. Demonstrating a risk of future harm, A. Judson Wells, Ph.D. provided statistics and opined in his expert report that “for Mr. Atkinson to continue in a smoke filled cell would increase his risk of death or non-fatal heart attack or stroke.” With respect to the causal link between ETS and appellee’s symptoms, Dr. Rizzo’s letter concluded that there was a “reasonable medical probability” that appellee’s symptoms (itchy and burning eyes, chest pains, a sore throat, a persistent cough with sputum production, paroxysms of coughing and resulting headaches) were precipitated by second-hand smoke. Although other Courts of Appeals have affirmed a grant of summary judgment to prison officials on similar evidence as “too speculative,”[6] we are deciding the issue of qualified immunity, and cannot evaluate the sufficiency of the evidence. See Johnson, 515 U.S. at 319, 115 S.Ct. 2151. In addition, appellee has presented evidence that society has become unwilling to tolerate the imposition on anyone of continuous unwanted risks of second-hand smoke, citing Executive Order 71, in which the Governor of Delaware banned smoking in state buildings except in certain designated areas.[7] As to the second Helling element, defendants’ answers to Atkinson’s interrogatories and the depositions of Way, Phelps, and Par *266 ker demonstrate that appellants knew tobacco smoke was dangerous. Additionally, the District Court relied upon Atkinson’s statements that he either spoke or wrote to all appellants regarding unreasonable ETS he was experiencing.
2. Present Injury Claim
Atkinson’s present injury claim for ETS exposure also is grounded in a clearly established constitutional right. Although Helling dealt only with prisoner’s risk of future harm, the Supreme Court clearly established the framework for analyzing claims of present harm in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). See Weaver, 45 F.3d at 1256. In Weaver, a case directly on-point, the Court of Appeals for the Eighth Circuit held that Estelle clearly established that prison officials could not be deliberately indifferent to a prisoner’s existing serious medical needs caused by ETS. Id. at 1256. In affirming the District Court’s denial of qualified immunity to the prison officials the Weaver Court stated, “Such claims were first recognized by the Supreme Court almost two decades ago.” Id. at 1256.
In Estelle, the Supreme Court concluded that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, which violates the Eighth Amendment. 429 U.S. at 104, 97 S.Ct. 285. The Estelle Court recognized that even in less serious cases, where the prisoner does not experience severe torment or a lingering death, the infliction of unnecessary suffering is inconsistent with standards of decency. See id. at 103, 97 S.Ct. 285. Specifically, the Supreme Court stated: “In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend ‘evolving standards of decency’ in violation of the Eighth Amendment.” Id. at 106, 97 S.Ct. 285.
Atkinson has alleged a serious medical need to which appellants were deliberately indifferent. As this Court explained in Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326 (3d Cir.1987), “The standard enunciated in Estelle is two-pronged: ‘[i]t requires deliberate indifference on the part of the prison officials and it requires the prisoner’s medical needs to be serious.’ ” Id. at 346, quoting West v. Keve, 571 F.2d 158, 162 (3d Cir.1978). Although this Court has defined a medical need as serious if it has been diagnosed by a physician as requiring treatment, we also have recognized: “Estelle makes clear that if ‘unnecessary and wanton infliction of pain,’ ... results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the Eighth Amendment.” Id. at 347. Needless suffering resulting from a denial of simple medical care, which does not serve any penological purpose, is inconsistent with contemporary standards of decency and thus violates the Eighth Amendment. See id.
In Weaver, the Court of Appeals for the Eighth Circuit specifically recognized that severe headaches, dizziness, nausea, vomiting, and breathing difficulties stemming from exposure to ETS constituted a serious medical need, which required removal of the prisoner from a smoking environment under the Eighth Amendment. Id. at 1254. Similarly, other Courts of Appeals have recognized that an illness arising from an inmate’s exposure to ETS can constitute a serious medical condition. See, e.g., Alvarado, 267 F.3d at 651 (“[Prisoner's complaint stated an Eighth Amendment claim when he alleged that because of the prison officials’ deliberate indiffer *267 ence, he was being exposed to levels to ETS which aggravated his chronic asthma, thereby endangering his existing health, a claim recognized as an Eighth Amendment violation twenty-five years ago in Estelle v. Gamble....”);[8] Hunt v. Reynolds, 974 F.2d 734, 735-36 (6th Cir.1992). The Hunt Court determined that:
“Medical consequences of tobacco smoke do not differ from other medical problems. Prisoners allergic to the components of tobacco smoke, or who can at *268 tribute their serious medical conditions to smoke, are entitled to appropriate medical treatment, which may include removal from places where smoke hovers” .... Thus we will adhere to the position, adopted by every circuit to address the issue, that the Eighth Amendment’s objective component is violated by forcing a prisoner with a serious medical need for a smoke free environment to share his cell with an inmate who smokes.
Id., quoting Steading v. Thompson, 941 F.2d 498, 500 (7th Cir.1991).
We cannot conclude that appellants are entitled to qualified immunity. Atkinson has fulfilled Sauciers first prong for denying qualified immunity by alleging a violation of a clearly established constitutional right. As both the Weaver and Alvarado Courts point out the Constitutional right alleged by Atkinson was established over two decades ago by the Supreme Court in Estelle. See Alvarado, 267 F.3d at 651; Weaver, 45 F.3d at 1256. Atkinson’s amended complaint alleges that he was exposed, with deliberate indifference, to constant smoking in his cell for over seven months and as a result suffered nausea, an inability to eat, headaches, chest pains, difficulty breathing, numbness in his limbs, teary eyes, itching, burning skin, dizziness, a sore throat, coughing and production of sputum. The dissent describes these symptoms as “causing discomfort somewhere between that of hay fever and the common cold” and notes that “millions of people not in prison voluntarily tolerate similar levels of risk every day from second-hand smoke and numerous other sources.” However, unlike individuals who voluntarily expose themselves to ETS, a prisoner cannot simply walk out of his cell whenever he wishes. When a susceptible prisoner is confined to a cell, a small and confined space, with a “constant” smoker for an extended period of time, such symptoms may transform what would otherwise be a passing annoyance into a serious ongoing medical need. Additionally, Atkinson has fulfilled the second prong of Saucier’s test by demonstrating that the constitutional right was clearly established by the Hunt, Weaver and Estelle Courts on-or before his own claim arose in 1998—1999. See Estelle, 429 U.S. at 104, 97 S.Ct. 285 (“We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the ‘unnecessary and wanton infliction of pain,’ ... proscribed by the Eighth Amendment.”); Weaver, 45 F.3d at 1256 (recognizing that severe headaches, dizziness, nausea, vomiting, and breathing difficulties stemming from exposure to ETS constitutes a serious medical need, which requires removal of the prisoner from a smoking environment under the Eighth Amendment); Hunt, 974 F.2d at 735-36 (concluding prisoner could state a present injury claim for ETS exposure); see also Alvarado, 267 F.3d at 651-52 (“[Prisonerj’s complaint stated an Eighth Amendment claim when he alleged that because of the prison officials’ deliberate indifference, he was being exposed to levels of ETS which aggravated his chronic asthma, thereby endangering his existing health, a claim recognized as an Eighth Amendment violation twenty-five years ago in Estelle v. Gamble .... ”).[9] Moreover, Dr. Rizzo, an examining physician, has concluded that these symptoms possibly were precipitated by Atkinson’s expo *269 sure to ETS.[10] The District Court found that deliberate indifference to these alleged symptoms constituted a violation of clearly established law, and we agree. Atkinson alleges that when he tried to seek help at the prison infirmary the treating nurse responded that she was unable to transfer him to a cell with a nonsmoking roommate. Similarly, Atkinson has produced evidence that after telling prison officials about his sensitivity to ETS no change was made in housing conditions. This evidence demonstrates deliberate indifference on the part of prison officials. See Farmer, 511 U.S. at 837, 114 S.Ct. 1970 (“[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety....”).
B. The Retaliation Claim
Appellee asserts that appellants harassed him in retaliation for filing his ETS lawsuit. Appellants contend that they are entitled to qualified immunity.[11]
With respect to this claim, the right implicated under the first prong of the Saucier test for qualified immunity is the First Amendment right of prisoners to petition the court. See Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d Cir.1981). In Milhouse, this Court held that a prisoner alleging that he was subjected to a series of eonspiratorially planned disciplinary actions in retaliation for filing a civil rights suit against prison officials stated a cause of action for infringement of the prisoner’s First Amendment right. Id. Here, appellee’s complaint states a similar claim, and therefore meets the first part of the Saucier test by alleging a violation of a recognized constitutional right.
As to the second part of the Saucier inquiry, the Milhouse Court clearly established a prisoner’s right to access the courts so that a reasonable prison official would know that he violates this right if he retaliates against a prisoner for filing a lawsuit. The Milhouse Court stated: “The right of access to the courts must be ‘adequate, effective and meaningful,’ ... and must be freely exercisable without hindrance or fear of retaliation.” Id. at 374 (internal citation omitted), quoting Bounds v. Smith, 430 U.S. 817, 822, 97 *270 S.Ct. 1491, 52 L.Ed.2d 72 (1977). In Milhouse, the prisoner alleged that prison officials were violating his rights by preventing him from celebrating religious holidays. Id. at 372. Thereafter, prison officials allegedly transferred the prisoner to a less desirable cell house and committed other acts of revenge against him for filing the lawsuit. Id. Although the District Court dismissed the First Amendment retaliation claim, this Court reversed stating: “If [the prisoner] were able to prove an infringement of his first amendment right of access to the courts, he would successfully state a cause of action arising under the constitution.” Id. at 374.
Appellee has asserted a claim similar to that in Milhouse, that prison officials took retaliatory actions against him for filing a civil rights lawsuit against them. Appellee claims that he was moved to administrative segregation, humiliated by being forced to disrobe unnecessarily, denied food and access to legal materials and advice, and threatened and subdued by the use of excessive force, all in revenge for filing his ETS claim. Milhouse clearly established that such retaliatory actions, if proven, are not legal. Thus, Saucier’s second prong is satisfied and appellants are not entitled to qualified immunity.
C. The Supervisory Appellants
Supervisory appellants Parker, Phelps, Williams, and Taylor contend that appel-lee failed to present evidence sufficient to demonstrate personal involvement in or actual knowledge by them of the alleged constitutional torts allegedly committed by appellants Way and Green, and therefore that they are entitled to qualified immunity. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988) (“A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior. ... Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence .... ”). In Rode, a civilian employee of the Pennsylvania State Police joined Governor Thornburgh and State Attorney General Zimmerman as defendants in a S 1983 retaliation suit against her superiors. This Court affirmed the District Court’s determination that grievances filed with state officials’ offices were insufficient to prove actual knowledge and acquiescence by the state officials. See id. at 1208 (“In a large state employing many thousands of employees, a contrary holding would subject the Governor to potential liability in any case in which an aggrieved employee merely transmitted a complaint to the Governor’s office of administration .... ”).
Appellants suggest that the deposition and interrogatory answers of a single prisoner are not sufficient to establish a genuine issue of material fact as to whether the supervisory appellants had actual knowledge of and acquiesced in the commission of the alleged constitutional torts. Although appellants couch this argument as one relating to qualified immunity, this is the sort of evidence weighing that we cannot entertain given our limited jurisdiction on this appeal. See Johnson, 515 U.S. at 313, 115 S.Ct. 2151. In the present case, the District Court concluded that there is sufficient evidence that appellee either wrote or spoke to each supervisory defendant regarding both his exposure to ETS and the retaliatory harassment by appellant Way. We lack jurisdiction to evaluate the sufficiency of this evidence. See id.
Alternatively, appellants contend that Rode requires us to rule as a matter of law that such correspondences or conversa *271 tions do not constitute sufficient evidence of actual knowledge and acquiescence. We, conclude however, that Rode is factually distinguishable from the present case. The Governor and the Attorney General in that case were much farther removed from the state officials committing the alleged constitutional torts than the supervisory appellants in this case. Here, only Taylor holds a state-wide office. Moreover, a governor heads the entire executive branch of a state’s government; Taylor is charged with oversight of a specific state entity responsible for housing prisoners. The scope of his responsibilities are much more narrow than that of a governor or state attorney general, and logically demand more particularized scrutiny of individual complaints. Similarly, the other supervisory appellants have even narrower responsibilities as links in a chain of command within a single prison. We cannot say as a matter of law that the supervisory appellants did not have actual knowledge when appellee has produced evidence that they did.
IV. CONCLUSION
We express no view as to whether appel-lee will be able to establish the objective and subjective elements of his ETS claims or prove his other claims.
For the foregoing reasons, we affirm the District Court’s denial of appellants’ motion for summary judgment with respect to Atkinson’s ETS and retaliation and excessive force claims. The appeal of the supervisory appellants is dismissed for lack of jurisdiction.

. The appellants are Stanley Taylor (Commissioner of the Department of Correction), Warden Raphael Williams, Major Perry Phelps, Sergeant Phillip Parker, Correctional Officer Fred Way, and Corporal Andre Green. All ranks are those held by appellants at the time of filing of the complaint.

. We accept the facts as the District Court stated them in its opinion.

. Instead of relying upon cases that directly deal with the question of whether prison officials should be afforded qualified immunity in ETS suits, the dissent cites to cases which in our view are inapplicable. See Henderson v. Sheahan, 196 F.3d 839, 853 (7th Cir.1999); Oliver v. Deen, 77 F.3d 156, 159 (7th Cir.1996). The Henderson and Oliver Courts did not consider the issue of qualified immunity but affirmed grants of summary judgment to the defendants based on a lack of evidence. See Henderson, 196 F.3d at 853; Oliver, 77 F.3d at 159. Moreover, in a later case the Court of Appeals for the Seventh Circuit arguably made the strongest ruling that ETS claims are clearly established for the purposes of qualified immunity: “Given the decision in Helling, the right of a prisoner to not be subjected to a serious risk of his future health resulting from ETS was clearly established in 1998-99.” Alvarado v. Litscher, 267 F.3d 648, 653 (7th Cir.2001).

. The dissent distinguishes ETS cases that survive a motion to dismiss from those involving a denial of summary judgment by noting that the former require no evidentiary support for a plaintiff's claims: "motions to dismiss [are submitted at] a much easier stage to survive than summary judgment because, unlike summary judgment, motions to dismiss require no evidentiary support for the plaintiffs' claims.” In making this argument the dissent appears to be evaluating the underlying evidence. This is the exercise that Ziccar-di forbids us from undertaking on this appeal:
As we understand Johnson, if a defendant in a constitutional tort case moves for summary judgment based on qualified immunity and the district court denies the motion, we lack jurisdiction to consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove; but we possess jurisdiction to review whether the set of facts iden *264 tified by the district court is sufficient to establish a violation of a clearly established constitutional right.
288 F.3d at 61; see also Sanders v. Brundage, 60 F.3d 484 (8th Cir.1995) (refusing to consider "insufficient evidence” argument on appeal from denial of qualified immunity on a motion for summary judgment for prisoner's ETS claim). The present appeal from appellants' denial of summary judgment, however, is interlocutory in nature and based on a denial of qualified immunity. Because the Supreme Court’s ruling in Johnson prevents us from weighing the evidence, the present case is more analogous to a 12(b)(6) motion, where we would not evaluate the underlying evidence to support the plaintiff's claims which the District Court chose to accept. See Ziccardi, 288 F.3d at 61.

. The dissent characterizes Wairen as a cursory opinion lacking persuasive value that is not binding on this Court. However, the dissent fails to acknowledge that Warren is directly on-point. See Warren, 196 F.3d at 333 ("We hold that after Helling, it was clearly established that prison officials could violate the Eighth Amendment through deliberate indifference to an inmate's exposure to levels of ETS that posed an unreasonable risk of future harm to the inmate's health.”). The facts and procedural posture of the Warren decision, a denial of qualified immunity on summary judgment, are a carbon copy of the present case.

. For an example, see Henderson, 196 F.3d at 853. The procedural posture of Henderson, an appeal from a grant of summary judgment to prison officials for lack of evidence of future harm, allowed the Court of Appeals to evaluate the sufficiency of the evidence. See id. If appellee can produce evidence of future harm, he may be able to recover monetary damages. See Fontroy, 150 F.3d at 244. However, the problematic quantification of those future damages is not relevant to the present inquiry concerning whether the underlying constitutional right was clearly established so that a reasonable prison official would know that he subjected appellee to the risk of future harm. Moreover, even if appel-lee is unable to establish a right to compensatory damages, he may be entitled to nominal damages. See Pryer v. C.O. 3 Slavic, 251 F.3d 448, 453 (3d Cir.2001) ("Where a constitutional deprivation has not caused actual injury, an award of nominal damages may be appropriate.”).

. The dissent characterizes this reference as an attempt to form a societal consensus from a single state regulation. However, we refer to the regulation merely to show that Atkinson has offered some proof of a societal consensus. Proof of a national consensus might include, inter alia, the federal regulation which protects the public and federal employees from ETS in all federal workplaces:
Pursuant to Executive Order 13058, "Protecting Federal Employees and the Public From Exposure to Tobacco Smoke in the Federal Workplace” (3 CFR, 1997 Comp., p. 216), it is the policy of the executive branch to establish a smoke-free environment for Federal employees and members of the public visiting or using Federal facilities. The smoking of tobacco products is prohibited in all interior space owned, rented, or leased by the executive branch of the Federal Government, and in any outdoor areas under executive branch control in front of air intake ducts.
41 CFR § 101-20.105-3(a).

. The dissent points out that the Seventh Circuit decisions of Henderson and Oliver rejected present injury claims similar to Atkinson’s because the prisoners in those cases were unable to prove that their medical needs were sufficiently serious. See Henderson, 196 F.3d at 846; Oliver, 77 F.3d at 161. Again, in our view the dissent engages in the sort of evidence weighing that we are forbidden from undertaking by Johnson, 515 U.S. at 313, 115 S.Ct. 2151. See Ziccardi, 288 F.3d at 61; see also Sanders, 60 F.3d at 487 (refusing to consider “insufficient evidence” argument on appeal from denial of qualified immunity on motion for summary judgment for prisoner's ETS claim). Moreover, the Oliver Court did not conclude that such symptoms were insufficiently serious as a matter of law. See Oliver, 77 F.3d at 161 (“On this record, Oliver has not demonstrated that he was subjected to cruel and unusual punishment.”). As the dissent in Oliver clearly explained, the entire panel agreed that the prisoner's allegations (which are similar to Atkinson's) satisfied the requirements of Estelle:
No one disputes that Oliver’s allegations were enough to satisfy Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), Farmer and the other Eighth Amendment cases. Both here and in the lower court the issue has been instead whether there were disputed issues of fact. Viewed in this light, it is clear that there is a material dispute of fact about the severity of Oliver’s asthma problem, which in turn raises a material dispute of fact about whether the prison officials were deliberately indifferent to his serious medical needs.
Oliver, 77 F.3d at 161 (Wood, J., dissenting) (emphasis in original). Although the Court of Appeals found the Henderson prisoner's allegations insufficient as a matter of law, we believe it is clear that breathable air that will not constantly subject a susceptible prisoner to severe allergic reactions is the sort of "minimal civilized measure of life's necessities” that the Eighth Amendment protects. See Farmer, 511 U.S. at 834, 114 S.Ct. 1970. Therefore, we refuse to hold as a matter of law that Atkinson's symptoms were insufficiently serious.
The dissent cites to other decisions to support its general proposition that the tide has turned against ETS claims in the Courts of Appeals. See Richardson v. Spurlock, 260 F.3d 495, 499 (5th Cir.2001) (affirming District Court's dismissal of prisoner's ETS claim as "frivolous”); Scott v. District of Columbia, 139 F.3d 940, 944 (D.C.Cir.1998) (reversing District Court's injunction mandating smoke-free environments for plaintiffs). Both cases are distinguishable from the present one. In Richardson, the prisoner's exposure was at best de minimis and the Court of Appeals for the Fifth Circuit clearly set it apart from cases where prisoners were housed in a severe ETS environment:
[T]he two Fifth Circuit cases that have recognized a potential ETS-based Eighth Amendment claim, the exposure to secondhand smoke was substantially more severe and sustained than that alleged by Richardson. See Whitley v. Hunt, 158 F.3d 882, 888 (5th Cir.1998) (the prisoner shared living quarters with a smoker); Rochon v. City of Angola, 122 F.3d 319, 320 (5th Cir.1997) (the inmate was "required to live and work in 'environments filled with tobacco smoke’ ”). In contrast, Richardson does not share living quarters with a smoker, nor does he work in a smoke-filled environment. . He only alleges that he .had to sit near some smokers during a bus ride on "several occasions.” We do not believe that society considers this treatment to "violate[ ] contemporary standards of decency-”
260 F.3d at 498-99. Unlike Richardson and Scott, the issue in this case does not involve a complete ban on all ETS exposure. Such a ban may be impractical (or impossible) for prison officials to implement. Here, we merely conclude that the District Court correctly determined that the level of ETS to which Atkinson claims he was exposed and his symptoms justify the denial of qualified immunity.

. Although Alvarado postdates the time when Atkinson's cause of action accrued, we cite to that case to demonstrate that, as the Court of Appeals for the Seventh Circuit recognized, the constitutional right which Atkinson asserts was clearly established over twenty-five years ago in Estelle.

. The dissent contends that Dr. Rizzo’s affidavit undermines Atkinson's claim. Aside from the matter that the dissent is weighing the evidence supporting the District Court's determination in contravention of Ziccardi, the dissent misconstrues Dr. Rizzo’s statements. Dr. Rizzo noted the following:
Roger Atkinson is a former cigarette smoker who was diagnosed with childhood asthma and may have symptoms of persistent reactive nasal passages and airways based on his response to exposure to seasonal changes in temperature and air quality. His spirometry is currently normal, but this does not preclude the presence of airway sensitivity.
(A. 127). If anything, this notation supports Atkinson's claim that he is particularly sensitized to air quality and that ETS seriously exacerbates his underlying condition. The dissent also points out that the affidavit of Dr. Keith Ivens weakens Atkinson's claim. This, however, takes this Court into the forbidden territory of evidence weighing.

. The basis for their claim is not clear. In their brief, appellants admit that the law regarding retaliation is clearly established: "It is well-settled law that correctional officials cannot retaliate against inmates due to the inmate's filing of lawsuits with the court." (Appellants' Br. at 22.) Appellants point to evidence and admissions by appellee that contradict his retaliation claims. However, we lack jurisdiction to weigh the evidence because the District Court's determination that the summary judgment record in this case raised a genuine issue of material fact was not a final decision as required by 28 U.S.C. § 1291. See Johnson, 515 U.S. at 313, 115 S.Ct. 2151.